Gerald WILGUS, individually and as agent for a limited partnership to be formed, and Salt Pond, L.P., a Delaware limited partnership, Plaintiff,

v.

SALT POND INVESTMENT COMPANY, a Delaware corporation and William P. Short, Jr., individually and Carl M. Freeman Associates, Inc., a Maryland corporation, Defendants.

Civ. A. No. 1056.

Court of Chancery of Delaware, Sussex County.

Submitted: May 7, 1985.

Decided: June 6, 1985.

**152**

Melvyn I. Monzack and Eric L. Grayson of Walsh & Monzack, Wilmington, for plaintiff.

N. Maxson Terry, Jr. of Terry, Jackson, Terry & Wright, Dover, for defendants Salt Pond Inv. Co. and William P. Short, Jr.

Randy J. Holland and William B. Chandler, III of Morris, Nichols, Arsht & Tunnell, Georgetown, for defendant Carl M. Freeman Associates, Inc.

WALSH, Vice Chancellor.

In this action for specific performance the plaintiff, Gerald Wilgus, individually and on behalf of a limited partnership, Salt Pond L.P. ("the Wilgus Group"), seeks enforcement of certain purchase agreements for the sale of a 380 acre tract of land adjacent to Bethany Beach, Delaware. The property in question is owned by the defendant William B. Short, Jr. and Salt Pond Investment Company, a family trust controlled by Short. The defendant Carl M. Freeman Associates, Inc., a Maryland corporation, ("Freeman") is also a signatory to a purchase agreement executed by Short covering the same tract which it claims matches, and thus supercedes, the Wilgus Group agreement under a preexisting right of first refusal. Alternative to its claim for specific performance the Wilgus Group seeks damages from Short for his alleged bad faith dealings during the course of negotiations. Short, in a counterclaim, seeks damages from the Wilgus Group for alleged tortious interference with the Freeman contract by the filing of a meritless claim and a notice of *lis pendens*. This is the decision after trial and post-trial briefing.

I

The land in dispute is, in the view of all parties, a highly prized site. Indeed, it may be the last large undeveloped beach-adjacent tract in the Bethany Beach area. It has been in the Short family for many years and was the subject of negotiations between Short and Freeman in 1981. The root of the present controversy, and the

basis for Freeman's claim, lies in the efforts by Freeman and Short to develop the Salt Pond site jointly at that time. Freeman had undertaken certain tests on the site and granted Short an interest free loan for five months in exchange for securing a right of first refusal on the site extending until April 30, 1986. The right of first refusal, expressed in a letter agreement which was recorded in the Office of the Recorder of Deeds for Sussex County in 1982, contained the following language:

If the Owners [Short] receive a written offer with respect to the Property, they shall send a copy of the offer to Freeman, who shall have the option for 30 days thereafter to enter into an agreement with the Owners upon the same terms and conditions as are contained in such offer and 60 days thereafter to go to settlement thereon.

The Short-Freeman joint development efforts were eventually abandoned because of regulatory restrictions but the right of first refusal remained in effect.

In the summer of 1983, Wilgus, a realtor and developer in the Bethany Beach area learned that the Salt Pond site might be for sale. He initiated negotiations with Short and the latter's attorney, Eugene H. Bayard, Esquire. At about the same time Wilgus concluded that the size of the site and its development potential required other investors. To that end he secured the interest of three other investors: Wayne Kreer, a home builder in the Bethany Beach area; George Haag, a builder and developer from the Washington area who was interested in developing beach property; and Robert L. Halbrook, Esquire, a Sussex County attorney and Bayard's law partner. Negotiations ensued on an informal basis over the next few months through personal contact and exchange of correspondence. Early in the negotiations, Short, through Bayard, set a purchase price of $6 million and that figure remained essentially unchanged. Alternative methods of payment, including a partial purchase money mortgage, were explored and

the parties discussed the payment of a real estate commission to Wilgus. Sometime during the course of these negotiations and certainly by November 23, 1983, the Wilgus Group became aware of Freeman's right of first refusal.

The first document executed by Short and the Wilgus Group is titled "Memorandum of Understanding" and was signed by both parties on December 8, 1983. The preamble and first paragraph of this instrument, which is in the form of a memorandum from Wilgus to Bayard, sets its tone:

I plan to meet again with the investors who wish to participate in purchasing the Salt Pond Property. The purpose of this letter is to outline the terms and conditions of our proposed offer to Salt Pond Investment Company (the "Company"). If our terms are acceptable to the Company, then I will present them to the investors.

(1) We would want an option to purchase the property. The option would run for 5 months beginning January 2, 1984, or 21 days from the date the Company delivers to me or Bob Halbrook a signed copy of this letter, whichever is later. We would pay $50,000 for the option. The option amount would be nonrefundable, except as noted below, but would be credited toward the downpayment in the event the option is exercised. During the period of 5 months, we will be obtaining the necessary permits to develop the property as a Residential Planned Community District (RPC). If Carl Freeman should exercise his right of first refusal, the option price of $50,000 would be refunded. The $50,000 would be put in a money market fund, interest to go to the Company unless Freeman exercises his option, in which case the interest is paid to us along with the $50,000.

The pertinent remaining terms of the agreement included the purchase price ($6 million with a purchase money mortgage or $5.3 million cash); the right to lease Short

family lands on the ocean front; a right of first refusal on other residual Short lands (subject to Freeman's prior right of first refusal); cooperation in rezoning efforts and the payment of a three percent real estate commission to Wilgus Associates, Inc. The final paragraph of the Memorandum of Understanding provided: "As soon as a copy of this letter is signed by the Company [Short], we will take it to our investors for approval." Although Wilgus delivered a check for $50,000 payable to the Wilson, Halbrook and Bayard law firm, he advised Halbrook not to deposit the check without notice to Wilgus. Wilgus claims that although the check was not supported by sufficient funds when delivered to Halbrook, he had the financial capability of securing funds to satisfy the check if given notice to do so.

On December 9, the day following its execution, Bayard forwarded the Memorandum of Understanding to Freeman by certified mail. In a covering letter Bayard advised Freeman that it had "30 days from the date of receipt of this letter to act or decline to act on the terms set forth in the enclosed Memorandum of Understanding." On December 16, Freeman replied through its Washington attorney, Richard David, rejecting Bayard's characterization of the Memorandum of Understanding as an offer to which Freeman must reply under its right of first refusal. David asserted that the Wilgus memorandum was not an offer since it was subject to approval by other investors and neither Wilgus nor Short was contractually bound by it. In David's words Wilgus "is simply shopping the deal."

Bayard advised Halbrook of David's position in language which suggested that the ploy had not succeeded. Although Halbrook believed that the Memorandum of Understanding was an enforceable contract between the parties which triggered Free-

man's right of first refusal he agreed that the Wilgus Group should submit a formal agreement which would, without question, force Freeman to exercise or decline its right of first refusal.[1] Halbrook then proceeded to draft what came to be known as the "Wilgus contract." It was executed by Wilgus and Short on January 7, 1984.

Although more elaborate in form, the basic terms of the January 7, 1984, agreement were the same. This document did not use the term "option" but the usual contractual language that "Buyer hereby buys from Seller and Seller hereby sells to Buyer * * *." The Wilgus contract also contained one significant new provision. It granted the Buyer a right of first refusal to purchase or lease the Short residual lands until August 1, 1998, in contrast to the Memorandum of Understanding provision which simply tracked Freeman's right of first refusal as to the residual lands. Wilgus, at least, viewed this change as an additional concession from Short. The January 7, agreement also contained a specific contingency for the return of the $50,000 deposit in the event Freeman exercised its right of first refusal.

The Wilgus contract was forwarded to Freeman by Bayard on January 9, 1984. Although Bayard's cover letter contained "tongue-in-cheek" language rejecting David's view of the effect of the Memorandum of Understanding it also advised Freeman to respond to the enclosed Wilgus contract: "In fairness to them [Wilgus], Phil asks that you speak now or purchase and develop somewhere else." On January 24, David replied to Bayard acknowledging receipt of the Wilgus contract by Freeman on January 13 and noting that "Freeman's right of first refusal terminates on Monday, February 13, 1984."

On February 10, a Friday, Bayard received a letter from David dated February

---

1. At trial, Halbrook was still of the view that the memorandum was enforceable against Short and was an "offer" to be matched by Freeman under the 1981 right of first refusal. Bayard, on the other hand, testified that although he "kid-

ded" David about his rejection letter being simply "verbiage," he shared David's view concerning the legal efficacy of the Memorandum of Understanding.

7 enclosing a $50,000 check and a contract signed by Freeman essentially tracking the Wilgus contract. David attempted to render the Freeman contract a "mirror image" of the Wilgus contract with the only significant change being to extend to Freeman the Wilgus right of first refusal as to the residual lands, in place of the right of first refusal contained in the 1981 agreement. David also made a technical change to add Short as an individual seller, a conceded omission in the Wilgus agreement.

The Freeman contract was received by Bayard with some surprise and by Halbrook with considerable consternation. Bayard immediately made arrangements with Short to execute the contract and obtain the $50,000 deposit while Halbrook advised the other principals of the Wilgus Group of the unfavorable development. Before Short signed the agreement, however, Bayard telephoned David to discuss certain modifications of the Freeman contract. Bayard advised David that Freeman's settlement date was controlled by the 1981 agreement not by the August 1, 1984, settlement date in the Wilgus contract. Although the point was arguable, David believed that Bayard was probably correct and authorized the advancement of the settlement date to April 13, 1984. Bayard also advised Freeman that since the Wilgus contract would be superceded, Short should not be obligated to pay Wilgus a three percent real estate commission. Since the payment of a commission was solely the responsibility of the seller, this change was of no consequence to Freeman and David acquiesced. David did request, however, that Short indemnify Freeman against any claim Wilgus might assert for a commission. The two changes agreed upon by the attorneys were noted and initialed by Short on February 10, and Short departed with Freeman's check. It was agreed by Bayard and David that, Henley Graves, Esquire, Freeman's local counsel would initial the contract on Freeman's behalf the following Monday, February 13. On that date, Graves delivered a letter to Bayard which reflected the changes in the settlement date, the deletion of the commission and the understanding concerning indemnification. Graves also initialed the contract changes on Freeman's behalf on the same date.

On February 14, Halbrook retrieved the $50,000 Wilgus Group deposit from the law firm's control and deposited it in a separate account under his control for the benefit of the Wilgus Group. After securing independent legal advice the Wilgus Group determined to file suit and on March 16, this action was commenced.

Originally the action named only Short and Salt Pond as defendants but notice of its filing and a Notice of *Lis Pendens* (which was also recorded in the Sussex County Office of the Recorder of Deeds) was sent by counsel for the Wilgus Group to Graves. Wilgus filed a separate action against Short in the Superior Court for recovery of the $180,000 real estate commission. Freeman meanwhile proceeded to arrange financing for the pending April 13 settlement and conducted appraisals and land studies preparatory to site acquisition. By late March it appeared that counsel for Wilgus and Short had reached terms for the settlement of the entire dispute. To that end Short requested Freeman to contribute up to one half, or $90,000, of the claimed real estate commission. In exchange for such participation, Short agreed to extend the settlement date to August 1, 1984. Short also requested Freeman to advance him an additional deposit of $75,000 to be applied against the purchase price. Freeman agreed to both proposals but the Wilgus-Short settlement came unraveled in the next few weeks. Freeman concluded that the specific performance action and the *lis pendens* filing cast a serious cloud on Short's title. It determined, therefore, to intervene in this action and to decline to proceed to settlement until the question of enforceability of the Wilgus contract was judicially determined.

## II

The Wilgus Group mounts a dual attack on the validity of the Freeman-Short agree-

ment. First, it contends that the Memorandum of Understanding between it and Short constituted an "offer" within the meaning of Freeman's 1981 right of first refusal and that Freeman's failure to match it left Short free to contract. Alternatively, the Wilgus Group argues that if its contract of January 7 triggered the right of first refusal, Freeman's attempted response did not qualify in substance or in timing. These contentions will be separately considered.

It is generally recognized that the holder of a right of first refusal is not required to respond to any offer received by the putative seller but only to such an offer as the seller indicates a willingness to accept. 1 *Corbin on Contracts* § 11. Thus the offer required to be matched must by its terms confer upon the putative seller the power to bind the offeror merely through acceptance of its terms. In the words of the *Restatement* (Second) *of Contracts:* "An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Restatement* (Second) *of Contracts* § 24 p. 71 (1981). When the putative seller, in compliance with a preexisting right of first refusal, advises the holder of that right of first refusal of the terms of the offer to be matched he is in effect communicating his willingness to accept the terms of the offer and form a binding contract if the offer is not matched. Such an understanding is implicit in the language of the right of first refusal provision in this case. Any other view would suggest that the parties engage in a useless act—the communicating of an offer the seller had no intention of accepting. Moreover, that is how Short and his counsel viewed their obligation.

If the offer must, by acceptance of its terms, create an enforceable agreement the Wilgus Memorandum of Understanding fails to rise to that level. The repeated use of the term "would" to modify the intentions of the Wilgus investors suggests the indefiniteness of the purchaser's undertakings. Indeed, the final sentence of the document: "As soon as a copy of this letter is signed by the Company, we will take it to our investors for approval" coupled with language calling for crediting the downpayment against the purchase price "in the event the option is exercised" clearly indicates the contingent nature of the document. Although Short signed the document it remained unenforceable as to the investors and until such time as the investors approved its terms it was merely an offer to further negotiate. *Tull v. Mr. Donut Development Corp.*, Mass.App., 7 Mass.App. 626, 389 N.E.2d 447 (1979). As such it was not an offer which Freeman was required to match under the right of first refusal. Moreover, the conduct of the Wilgus Group and Short in drafting and submitting a formal noncontingent sales agreement after David's letter of rejection was a tacit recognition that the Memorandum of Understanding did not achieve the intended result of forcing Freeman's hand.

### III

The Wilgus Group next asserts that if its January 7, contract triggered Freeman's right of first refusal the response was not timely and failed to match it in two material respects. Freeman counters that it submitted a contract to Short which was virtually identical to the Wilgus Group contract and, that, under standard principles of contract construction, its execution by both parties was timely.

The 1981 Freeman right of first refusal contained two time restrictions: a thirty day matching period and a sixty day settlement period once the offer was matched. The matching period required Freeman "to enter into an agreement with the Owners" thirty days after the Owners "send a copy of the offer to Freeman." The Wilgus Group argues that this language clearly requires the thirty day period to commence on the date the offer is sent, regardless of when it was received. Freeman maintains that the matching period provision is am-

biguous but actions of the parties to the agreement reflect an intention to commence the thirty day period on the date of receipt.

■ When viewed in the context of the entire first refusal provision the thirty day matching period is arguably ambiguous. If the period commenced on the date notice of an offer were sent, the period in which Freeman could review the offer and determine its course of action obviously would be less than the thirty days specified. How much less would depend on the vagaries of the mail or any other means Short might use to dispatch the offer since the method of transmittal is not defined. Under settled principles of contract construction, where an ambiguity exists the intention of the parties is best gleaned from their actions, *i.e.*, by what they believed the language required of them. *Morgan v. Wells*, Del.Ch., 80 A.2d 504 (1951); *Artesian Water Co. v. State, Dept. of Hwys. & Transp.*, Del.Supr., 330 A.2d 441 (1974).

■ The intentions of Freeman and Short are reflected in the actions of their respective attorneys to whom they delegated the responsibility for compliance with the terms of the right of first refusal. Bayard's transmittal letter of January 10, 1984, enclosing the Wilgus contract, was sent by certified mail, return receipt requested. The return card reflected receipt by Freeman on January 13. In formally acknowledging receipt of the contract by his client on that date, David advised Bayard on January 24, 1984, that: "Accordingly, Freeman's right of first refusal terminates on Monday, February 13, 1984." Although February 13, was actually the thirty-first day after the date of receipt David viewed it as the operative date because the previous day was a Sunday. Bayard apparently was of the same view.

Halbrook, who was made aware of David's January 24 letter shortly after receipt by Bayard, raised no objection to that calculation.

The Wilgus Group questions the force of the "Sunday rule" but it is unnecessary to grapple with that obtuse doctrine.[2] My view of the evidence leads to the conclusion that Short and Freeman became contractually bound on February 10, the date Short countersigned Freeman's tendered "mirror image" contract and accepted the deposit. Even though Bayard placed a February 13 date on the contract and Freeman delegated Graves authority to initial the changed provisions on that date, Freeman's contract which was essentially a signed offer matching one already tentatively accepted by Short required merely acceptance by Short. The modifications orally agreed to on that date did not effect material changes in Freeman's offer.

The first of the two disputed changes the settlement date, was a superfluous provision in the Freeman contract. Under the 1981 agreement, which continued to control the Short-Freeman dealings, Freeman was obligated to go to settlement on any matched offer within 60 days of its acceptance by Short. Freeman's attempt to use a different, and more liberal, settlement period was halfheartedly undertaken on theory that it matched the Wilgus settlement provision. David readily conceded the point on February 10 when Bayard called it to his attention. The second disputed change—the deletion of the real estate commission—had no effect on Freeman and did not decrease the consideration called for in the contract. This provision was of significance to Short but his obligation to pay it did not depend on whether Freeman agreed or disagreed that Wilgus had earned a commission through his ef-

---

**2.** The proposition that when the day for performance under an agreement falls on a Sunday performance on the following day is timely is a creature of statute not common law. 74 Am. Jur.2d *Time* § 17. Delaware has no such statute although by Court Rule, acts required to be done by statute or Court Rule are so extended. Chancery Rule 6(a); Superior Court Civil Rule 6(a); cf., *Schneyer v. Shenandoah Oil Corporation*, Del.Ch., 316 A.2d 570 (1974).

forts in fashioning a superceded offer.[3] Wilgus' entitlement did not arise directly out of the Freeman contract. It could hardly be argued that the agreement between Short and Freeman would not be enforceable if it contained no referral to the payment of a commission to Wilgus for his efforts in connection with a superceded contract of sale. In sum, I conclude that the modifications formalized on February 13, were not material to the enforceability of the contract formed on February 10, when Short accepted the Freeman offer and took receipt of the deposit. Unquestionably, there was a meeting of the minds on the earlier date. Finally, inasmuch as the February 10, contract contained all essential terms it is clear that the transaction did not violate the Statute of Frauds. 6 *Del.C.* § 2714; 2 *Corbin on Contracts* § 499.

■■■ The Wilgus Group also seeks to invalidate the Freeman contract on the ground that the settlement date of April 13 does not comply with the sixty day period required by the right of first refusal. This argument hinges on the previously discussed contention that the last day for acceptance of the contract was either February 9 (30 days from the sending of the contract) or February 12 (30 days from receipt). Since I have concluded that Short made an effective acceptance of a valid matching offer on February 10 this argument is unavailing. Nor does it aid the Wilgus Group to note that the parties inserted a settlement date of April 13 when they formalized the changes on February 13. As noted previously it is the sixty day settlement term contained in the right of first refusal agreement which controls, not the date later selected by the parties. Moreover, the selected language of the Freeman contract calls for settlement "on or before April 13, 1984." There is no indication that Freeman would have been unwilling or unable to settle by April 10

and in view of the further extension of the settlement date in connection with efforts to settle the entire dispute, the fixing of a settlement date has little significance. The important point is that Freeman's contract was controlled by a settlement date in conformity with the right of first refusal. The Wilgus Group, whose contract called for a much later settlement date (August 1, 1984) can hardly be said to have been prejudiced by a matching offer which required settlement in a much shorter period of time.

■■■ The filing of this action and the *lis pendens* notice of course mooted the significance of any settlement date. But the filing of a Notice of *Lis Pendens* as a deterrent was unnecessary. It is the pendency of the equitable action which serves as constructive notice to any purchaser pendente lite that it is bound by the final result of the litigation. *Connecticut M.L.I. Co. v. Merritt-Chapman & Scott Corp.,* Del.Ch., 163 A. 646 (1932); 2 *Pomeroy, Equity Jurisprudence* (5th Ed.1941) § 632 p. 727, 747. Once it became clear after March 29, 1984, that this litigation would proceed Freeman was entitled to decline settlement until final resolution of the Wilgus Group claim.

■■■ Finally, the Wilgus Group argues that the Freeman contract was not effective because its execution was not authorized by the Freeman Board of Directors. This argument seems somewhat strained in view of the evidence that Carl Freeman who signed the contract as President of Freeman Associates is also the owner of more than 80% of its voting stock. It is clear that the Freeman Board was advised on March 27, the first meeting after execution of the contract, that the offer made by Freeman to purchase the Salt Pond property had been accepted. It was not the practice of the Board to approve land acquisi-

---

**3.** I draw no conclusion on the question of whether Wilgus is entitled to a commission because his efforts produced a sale, albeit to a different buyer, on the same terms negotiated by him with Short's permission. The merit of that claim will be resolved in the Superior Court action.

tions or options secured by Carl Freeman since this was the business of the corporation. As President, Freeman was entitled to engage in the day-to-day activities of the corporation involving the sale and acquisition of real estate. Short did not question Freeman's authority and no Freeman shareholder has attacked the transaction as beyond the power of the President. In any event the Board's silence on March 27, is deemed acquiescence for the purpose of ratifying Freeman's act.

In sum, I conclude that the Freeman offer was timely and was cast in the same material terms and conditions as the Wilgus Group offer it sought to match. Its acceptance by Short on February 10, created a binding obligation which superceded the inchoate contractual rights of the Wilgus Group. Accordingly, the claim of the Wilgus Group for specific performance must be denied. In view of this holding it is unnecessary to consider the contentions of Freeman that the Wilgus Group lacks capacity to bring this action, lacked the financial ability to consummate settlement or acquiesced in the termination of its contractual claim by retrieving its deposit from Short's joint control.

## IV

As an alternative basis for recovery against Short, the Wilgus Group seeks damages for what it characterizes as a breach of an implied covenant of good faith by Short in favoring Freeman's efforts during the period of negotiations and in extending the settlement date. The focus of this claim is upon Bayard's actions as Short's attorney and agent. The Wilgus Group argues that Bayard took inconsistent positions on the validity of the Memorandum of Understanding, suggested modifications of the Freeman Contract on February 10, which qualified it as a matching offer and negotiated an extension of the settlement date without regard to the purported settlement of the underlying litigation.

The claim of unfair dealing reflects the understandable pique of the Wilgus Group in seeing its finely tuned acquisition effort thwarted at the eleventh hour by a third party's matching offer. It is true that an implied covenant of good faith and fair dealing is engrafted upon every contract. 5 Williston, *Contracts* § 670 (3rd Ed.1969); *Gilbert, et al. v. The El Paso Company, et al.*, Del.Ch., 490 A.2d 1050 (1985). This obligation requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the contract. *Restatement* (Second) *of Contracts* § 205 (1981).

The application of the implied covenant of fair dealing to Short's conduct is complicated by the fact that Short had a dual obligation to deal fairly. He was also required to honor Freeman's right of first refusal which predated his dealings with the Wilgus Group. If the matter be viewed as one of contractual priorities, Freeman's right to purchase was clearly superior and all parties recognized it as such. Even before the Memorandum of Understanding was drafted Wilgus and Halbrook were aware that Short could accept no offer by a third party until Freeman's right of first refusal had been declined.

Nor does the evidence support the claim that Bayard acted in bad faith toward the Wilgus Group in advancing Short's interests. Indeed, as to the events which transpired prior to February 10, the opposite inference can be drawn. In the early negotiations between Short and Wilgus and in the drafting of the Memorandum of Understanding and the Wilgus contract, the contracting parties were represented by partners in the same law office.[4] Bayard and

---

4. I do not suggest that either Halbrook or Bayard engaged in unprofessional activity. Their respective clients appear to have been fully aware of the law firm's dual representation.

Had Freeman not exercised the right of first refusal neither client would have felt aggrieved. But in view of the acknowledged need for Short to satisfy a prior contractual commitment be-

Halbrook apparently formulated a common approach to Freeman and if anyone's interests were prejudiced by this arrangement it was Freeman's. This fact is illustrated by Bayard's critical response to Freeman concerning David's rejection of the Memorandum of Understanding even though Bayard shared David's legal opinion.

The appearance of the "mirror image" Freeman contract on February 10, changed the attitude of Bayard and Short. Both realized that Freeman had decided to acquire the Salt Pond site and that the Wilgus offer had been matched. The changes initialed by Bayard were clearly in the best interests of his client but did not confer any material benefit to Freeman. As previously noted, the settlement date was controlled by the 1981 agreement and the striking of the real estate commission did not require the payment of additional consideration by Freeman. The disputed commission, if earned, belongs to the Wilgus real estate firm, Wilgus Associates, Inc., not to the Wilgus Group. Finally, with respect to the claim that Short unfairly extended the settlement date, the evidence does not support that contention. The extension of the settlement was prompted by what all parties believed was a resolution of the underlying claims, not by any previous underhanded agreement between Short and Freeman.

The Wilgus Group has not discharged its burden proving that Short breached an implied covenant of fair dealing under the unusual circumstances of this case. Accordingly, there is no basis for the assessment of damages against Short.

### V

The final matter to be addressed is Short's counterclaim against the Wilgus Group for tortious interference with the Freeman contract. The premise for this claim is the validity of the Freeman-Short contract which resulted from Short's ac-

ceptance of Freeman's matching offer—a matter now established. Short maintains that the Wilgus Group, in authorizing the filing of this action and a *lis pendens* notice, prevented settlement with Freeman. He further asserts that this action was filed spitefully and without a bona fide belief that it had merit.

Short concedes that it is a defense to an action for tortious contractual interference if the contract fails of performance because of the assertion of a good faith claim as to the subject matter of the contract. *Restatement* Second *of Torts* § 773 (1979). The test then is whether the evidence supports the contention of the Wilgus Group that it sought specific performance because of its good faith belief that the Freeman right of first refusal had not been validly exercised. I conclude that the evidence does support such a belief.

Without attempting to repeat the twists and turns in the chronology of the events which preceded the execution of the Freeman-Short contract, it is obvious that it spawned a series of questions. It is also fair to say that the uncertainty caused by the events of February 10, were attributable to the modifications sought by Short and/or Bayard. Freeman was content to submit a mirror image contract and did so. Its execution on February 10, by Short and acceptance of the deposit, in all likelihood, would have put to rest whatever color of right the Wilgus Group might assert concerning its interest in the Salt Pond property. The changes suggested by Bayard, particularly the deletion of the real estate commission, and the involvement of Henley Graves in a February 13, formalization, created a substantial problem of contract interpretation. Having created this problem which placed in question the entitlement to acquire such a valuable property, Short could hardly have expected the Wilgus Group to simply fade away. Their

fore accepting the Wilgus offer, the potential for conflict between Wilgus and Short was present. As previously noted, the attorneys held differing views concerning the legal effect of at least one document their clients executed—the Memorandum of Understanding.

recourse to this Court represented an appropriate exercise of their right to secure a ruling on their contractual interests.

Short also voices concern over the filing of a notice of *lis pendens.* As noted above, the use of such a device might be deemed an unnecessary annoyance but it adds little to the impact of the underlying litigation. If there is a bona fide basis for a claim of specific performance, as I conclude there was in this case, a *lis pendens* filing simply furnishes another form of constructive notice. Here, Freeman received actual notice of the filing of the complaint for specific performance and eventually intervened to assert its position. In any event, the notice of *lis pendens* will be ordered stricken incident to the denial of the petition for specific performance.

### VI

In summary, I conclude that the claim of the Wilgus Group for specific performance, based on the alleged invalidity of the Freeman-Short contract, is without merit. Accordingly, Short and Freeman are entitled to judgment on that cause of action. The alternative claim of the Wilgus Group for damages is also denied. Short's counterclaim for damages for tortious interference with the Freeman contract has not been established and the Wilgus Group is entitled to judgment on the counterclaim.

An appropriate order should be submitted.