In the

# United States Court of Appeals
### For the Seventh Circuit

———————

No. 14-1437

LIFE PLANS, INCORPORATED,

*Plaintiff-Appellant,*

*v.*

SECURITY LIFE OF DENVER INSURANCE COMPANY,

*Defendant-Appellee.*

———————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 C 8449 — **Ronald A. Guzmán**, *Judge.*

———————

ARGUED DECEMBER 3, 2014 — DECIDED AUGUST 31, 2015

———————

Before MANION, ROVNER, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Plaintiff Life Plans, Inc. appeals from the grant of summary judgment in favor of defendant Security Life of Denver Insurance Company. In 2011, the two companies signed an agreement under which Life Plans would broker and Security Life would insure life insurance policies financed through arbitrage. Roughly four months later, Security Life said it was terminating the agreement. Life Plans then sued Security Life for breach of contract and

breach of the implied covenant of good faith and fair dealing for refusing to offer the life insurance policies. The district court granted summary judgment, reading the contract to grant Security Life the right to terminate at any time. Life Plans has appealed the grant of summary judgment, as well as the district court's denial of a motion to alter the judgment and its earlier denial of leave to amend the complaint to add new claims against Security Life and its parent company.

We reverse. The evidence presents genuine disputes of material facts for both the contract and the implied covenant claims. The language of the agreement is ambiguous as to whether Security Life could terminate at will during the first three years of the agreed term. The extrinsic evidence of meaning is in conflict, so summary judgment is not appropriate on this claim. We also reject Security Life's alternative grounds for affirmance—that a condition precedent requiring Security Life's review and approval of the product, did not occur. The facts are disputed regarding what review was required by the agreement and whether the required approval was received. The district court also erred in denying Life Plans' motion to alter the judgment, which argued that the district court had improperly granting summary judgment on a claim that had not been covered by the summary judgment briefing.

The implied covenant claim under Delaware law also should not have been resolved on summary judgment. A reasonable jury could find that Security Life's conduct was arbitrary and unreasonable and had the effect of denying Life Plans the fruits of its bargain. Finally, the district court abused its discretion in denying Life Plans' motion for leave to amend its complaint. Leave to amend should be given

freely unless there is a showing of futility, undue delay, undue prejudice, or bad faith. None of those exceptions applied here. Life Plans filed the motion promptly after discovering the factual basis of its claims and acted to mitigate any delay that might result.

I.   *Factual and Procedural Background*

In reviewing a grant of summary judgment, we view the facts and draw reasonable inferences in the light most favorable to the non-moving party—here, Life Plans. *Spitz v. Proven Winners North America, LLC*, 759 F.3d 724, 730 (7th Cir. 2014). The background that we recount here is not disputed. We identify the disputed facts as they come up in our later discussion of summary judgment.

A.   *The Arbitrage Life Payment System*

Plaintiff Life Plans is a life insurance brokerage agency owned by Pamela Simon, who is also the company's President. Pamela Simon and her husband David Simon developed a new and apparently exotic method of financing life insurance policies they call the Arbitrage Life Payment Systems, or ALPS. The details of ALPS are not important for the issues we must decide; suffice it to say that significant changes in market interest rates can make what once seemed like an attractive deal for one side or the other look much less promising. Between 1994, an affiliate of Life Plans brokered ALPS-financed policies with insurers other than defendant Security Life from 1994 to 2005. In 2009 and 2010, Life Plans and Security Life discussed developing an ALPS-financed policy product together. The policy, later named "Peak," would be brokered by Life Plans and insured by Security Life.

B.  *The Joint Cooperation Agreement*

On June 7, 2011, Life Plans and Security Life signed a joint cooperation agreement regarding the sale of Peak policies. The core deal was that Security Life promised to accept at least $100 million in premiums for Peak policies each year for three years. Life Plans claims it would have collected approximately $21 million in commissions and fees for those policies.

That arrangement never came to fruition. On October 17, 2011, an attorney for Security Life wrote to Life Plans to say that Security Life was terminating the agreement because the Peak policy had not been approved through Security Life's internal review process.

C.  *Procedural History*

In October 2011, Life Plans sued Security Life in state court for breach of contract, or in the alternative, breach of the implied covenant of good faith and fair dealing. Security Life removed the suit to federal court based on diversity jurisdiction and promptly moved to dismiss the suit. The district court denied the motion to dismiss in July 2012.

The parties engaged in substantial discovery. After Life Plans took the deposition of Security Life's chief executive, Life Plans moved to amend its complaint to add a promissory estoppel claim against Security Life and a tortious interference claim against Security Life's parent, ING US, Inc., a new party that had not been named in the original complaint. The district court denied leave to amend the complaint.

After the close of discovery, Security Life moved for summary judgment, arguing that the failure of a condition

precedent discharged its obligations under the agreement. Life Plans responded and cross-moved for summary judgment on its claim that Security Life was liable for its three-year, $300 million commitment and could not prematurely terminate under the agreement.

The district court granted summary judgment for Security Life, concluding that Security Life could terminate the agreement at any time, and entered final judgment in favor of Security Life on all claims. Life Plans then filed a motion to alter the judgment, arguing that it was improper to grant summary judgment on Security Life's liability for pending insurance applications. Life Plans argued that, even if Security Life's termination was proper, it remained liable for failing to accept applications that were submitted before the termination. The district court denied the motion to alter, finding that Security Life had no obligation to process pending applications under the agreement and that Life Plans had forfeited the claim by failing to present such an argument in its own motion for summary judgment.

This appeal followed. Life Plans appeals three orders of the district court: the grant of summary judgment on both counts, the denial of the motion to alter the judgment regarding the pending applications claim, and the denial of the motion for leave to amend the complaint.

II.  *Summary Judgment*

We begin with the core of the parties' dispute: the district court's grant of summary judgment to Security Life. We review a grant of summary judgment *de novo*, viewing the evidence and drawing all reasonable inferences in favor of Life Plans, the non-moving party. *Spitz*, 759 F.3d at 730. Summary

judgment is appropriate only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A dispute over a material fact is genuine if a reasonable jury could return a verdict for the non-moving party on the evidence presented. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To survive summary judgment, the non-moving party must show evidence sufficient to establish every element that is essential to its claim and for which it will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322–23.

A. *Breach of Contract*

Life Plans claims that Security Life is liable for breaching the joint cooperation agreement. It offers two legal theories of breach: first, that Security Life violated the agreement by refusing to accept premiums for Peak policies; and second, that even if Security Life's termination was allowed under the agreement, it is still liable for refusing to process pending applications for Peak policies. We address both theories in turn. Pursuant to the choice-of-law provision in the contract, we apply Delaware law.

The role of a court in interpreting a contract is to give effect to the intention of the parties as expressed in the agreed terms. *Norton v. K-Sea Transportation Partners L.P.*, 67 A.3d 354, 360 (Del. 2013); *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985). We enforce the plain meaning of the words in the contract unless the parties intended a special meaning. *AT&T Corp. v. Lillis*, 953 A.2d 241, 252 (Del. 2008). We also must "construe the agreement as a whole, giving effect to all provisions therein." *GMG Capital Investments, LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d

776, 779 (Del. 2012), quoting *E.I. du Pont de Nemours & Co.*, 498 A.2d at 1113. "The meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan." *Id.*, citing *E.I. du Pont de Nemours & Co.*, 498 A.2d at 1113.

We begin our analysis with the text of the agreement. "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." *Eagle Industries, Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) (footnote and citation omitted). However, when the text of the agreement is "fairly susceptible of different interpretations or may have two or more different meanings," the contract is ambiguous. *Id.*

Only if the contract is ambiguous may a court consider extrinsic evidence of the parties' intent. *O'Brien v. Progressive Northern Ins. Co.*, 785 A.2d 281, 288–89 (Del. 2001). "It is a familiar rule that when a contract is ambiguous, a construction given to it by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight, and will, when reasonable, be adopted and enforced by the courts." *Radio Corp. of America v. Philadelphia Storage Battery Co.*, 6 A.2d 329, 340 (Del. 1939); see also *Viking Pump, Inc. v. Century Indemnity Co.*, 2 A.3d 76, 101 (Del. Ch. 2009) (extrinsic evidence of course of performance or conduct under contract shows the parties' intent).

### 1.  *The Right to Terminate*

Life Plans argues that Security Life breached the agreement by terminating it, which dashed Life Plans' hopes for $21 million in brokerage fees over three years. Security Life responds that the district court correctly found that it committed no breach because its termination was authorized by the agreement. As an alternative basis for affirmance, Security Life argues that it had no obligation to accept premiums because of the failure of a condition precedent—the Peak policy was not approved under Security Life's internal review process.

### a.  *Termination*

The district court ruled that the terms of the agreement were unambiguous and permitted Security Life to terminate at any time. The termination provision stated:

> Termination. This Joint Cooperation Agreement will continue indefinitely, until terminated by either party upon thirty (30) days written notice, delivered by certified mail. Company [Security Life] will complete processing of all applications received prior to notice of termination. Upon termination, all software, documents, customer information and other documents shared under this Joint Cooperation Agreement must be returned to the party providing same.

Joint Cooperation Agreement, § 8.i. If that were the only relevant language, Security Life and the district court would certainly be correct. But we cannot read this provision in isolation from the rest of the agreement. The agreement also

contained a provision that committed the parties to a three-year term:

> Commitments. The terms of this Joint Coopera-tion Agreement will govern the commitments of LPI and the Company with regard to the use of the Policy with the A.L.P.S.™ Program. The Company agrees to accept at least $100,000,000 of premium per twelve month period, exclud-ing reallocations and client payments, from Ju-ly 1, 2011 until June 30, 2014; provided howev-er, that the Company may in its sole discretion accept premium in excess of $100,000,000 in any such period.

*Id.*, § 1.a. The problem is how to harmonize these two provi-sions.

Life Plans argues that the "commitments" provision re-quired Security Life to accept at least $100 million in premi-ums each year for the first three years, so that only after three years could it terminate the arrangement by merely giving written notice. This interpretation, Life Plans con-tends, is consistent with the clause in the termination provi-sion that the agreement "will continue indefinitely, until terminated." The agreement says "continue" because the termination provision should govern after, but only after, the initial three-year commitment.

Security Life maintains that either party could terminate at any time without penalty because the termination provi-sion contains no limit on the timing of a termination. Ac-cording to Security Life, the termination provision effective-ly trumps the commitment provision, rendering the three-

year term optional. This reading construes the "will continue indefinitely" clause as referring to continuing from the date the agreement was signed rather than being limited to after the first three years.

The agreement is ambiguous. These two provisions conflict with one another and do not refer to one another. They are fairly susceptible to both interpretations. Life Plans' reading gives effect to the three-year term of commitment and harmonizes the "will continue indefinitely" clause in the termination provision with the commitment term. Security Life offers a more aggressive reading of the termination provision emphasizing the absence of language limiting the parties' rights to terminate, but that reading effectively nullifies the three-year provision. Both readings are at least plausible. In light of this ambiguity, we consider extrinsic evidence that might shed light on the parties' intent.[1]

---

[1] For such issues of contract interpretation, directly applicable case law is scarce. Security Life cites *Ferentinos v. Firstate Mortgage Corp.*, 1991 WL 18102 (Del. Super. Ct. 1991), *aff'd*, 608 A.2d 726 (Del. 1992), which involved a conflict between two termination provisions in an individual employment contract. One clause provided a five-year term unless certain reasons to terminate arose; a second clause allowed the employer to terminate without cause "at any time" by paying the employee at least one year's severance pay. The trial court found the contract unambiguously allowed termination at any time without cause (as long as the employer paid the severance pay), and the Delaware Supreme Court affirmed. Cases like these depend on close attention to the language used. Both clauses in *Ferentinos* were part of a termination provision, and the combination of termination "at any time" with severance pay seems to have been decisive in the court's reconciliation of the provisions. The five-year term clause dealt with causes for termination. The severance-pay clause allowed termination without cause, but only with severance pay. The two clauses could therefore be reconciled as intended to com-

Security Life offers evidence from the parties' negotiations: a prior draft of the agreement offered by Life Plans stating that the contract "shall not be terminable prior to the fulfillment of COMPANY'S $300 million A.L.P.S.™ premium commitment." Security Life argues that the absence of that limiting language in the final executed agreement shows that the parties understood the agreement to allow termination at any time. The district court was persuaded that the deletion of this limitation showed that Security Life's interpretation of the termination provision was correct.

But Life Plans argues that the language in the earlier draft has no bearing on the parties' intent in the final agreement. Life Plans points to deposition testimony by Security Life's attorney who drafted the final version of the agreement. That attorney said that a different document, drafted by Security Life, was used as the basis for contract negotiations. Life Plans argues that no inference can be drawn from differences between the early Life Plans draft and the final agreement because the Life Plans draft was never the subject of negotiations. The clause limiting termination in the earlier draft, which was tied to a total of $300 million in premiums rather than to the calendar, was not specifically deleted by the parties because it was never discussed. Life Plans also

---

plement one another, dealing with termination with or without cause, and providing that the severance pay would be due only during the first five years of the contract. In this case, however, it is much more difficult to reconcile the two relevant provisions while giving both meaning. We have difficulty seeing how Security Life could have made this specific promise: "The Company agrees to accept at least $100,000,000 of premium per twelve month period, excluding reallocations and client payments, from July 1, 2011 until June 30, 2014;" while also claiming a right to terminate at any time without consequence.

notes that Security Life offers no evidence to support an inference about the parties' intent other than the text of the draft itself.

The conflicting interpretations of the evidence present a genuine dispute of material fact precluding summary judgment. Where the parties offer competing reasonable inferences from extrinsic evidence, the disputed meaning of the contract is a question for the trier of fact not appropriately resolved through summary judgment. See *Mathews v. Sears Pension Plan*, 144 F.3d 461, 468 (7th Cir. 1998) (dispute over inferences from extrinsic evidence presented question of fact for jury on the ultimate issue of what contract meant); Restatement (Second) of Contracts § 212(2) (1981) ("A question of interpretation of an integrated agreement is to be determined by the trier of fact if it depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence.").

Other extrinsic evidence offered by the parties also fails to establish conclusively the parties' intent. Life Plans offers evidence of statements from various Security Life representatives indicating that they understood termination was prohibited during the first three years. David Simon's affidavit asserts that Security Life's attorney said in a phone call in June 2011 that Security Life "could not terminate the JCA without funding the Peak Policies." A Security Life internal email on September 7, 2011, from a Security Life executive to Britton and an ING U.S. executive, summarized the deal: "Our expectation is to write $300 million of single premium … over three years. … After 3 years, we review the product and decide if we wish to continue to write more business." (E-mail from Kafayi to Carney.) And Security Life proposed

an amendment to the agreement in July 2011 (a month after it was signed) that would have committed Security Life to accepting $100 million in premium for the first year but freely allowed termination in the second and third years. The draft amendment provided: "In the event of a Termination during [the second and third years], the Company shall only be obligated to accept premium until the effective date of termination of the Agreement."

Security Life interprets those statements more narrowly, arguing that Life Plans is taking them out of context and misunderstanding the speakers' intentions and the reason for the proposed amendment. Perhaps, but such arguments show this is not the stuff of summary judgment. The disputes over the inferences drawn from this evidence must also be resolved by the trier of fact. The agreement is ambiguous on this point, and the extrinsic evidence does not settle the dispute as a matter of law.

### b. *Failure of Condition Precedent*

Security Life presents an alternative ground for affirming: that it had no obligation to offer Peak policies because a condition precedent failed. The agreement provides, in relevant part:

> The obligation of the Company to offer the Policy shall be subject to the following conditions
>
> …
>
> ii. *Product Review and Approval Process*. Submission and approval of the Policy under Company's Product Review and Approval Process … .

Joint Cooperation Agreement, § 2.b. The parties dispute what the review process entailed and whether the Peak poli-

cy received approval before Security Life terminated the agreement.[2]

Both parties argue that the condition precedent term in the agreement is unambiguous. That's plainly incorrect. The "Product Review and Approval Process" is not defined in the agreement, and the phrase does not otherwise convey an "unmistakable meaning," *City Investing Co. Liquidating Trust v. Continental Casualty Co.*, 624 A.2d 1191, 1198 (Del. 1993), but rather is fairly susceptible to different interpretations. The meaning of this term "can only be known through an appreciation of the context and circumstances in which [it was] used," so we must consult extrinsic evidence. *Id.*, quoting *Klair v. Reese*, 531 A.2d 219, 223 (Del. 1987).

Security Life argues that the "Product Review and Approval Process" refers to a risk assessment by its management team that is informally called "PARP." (Product Review and Approval Process would seem to be abbreviated as PRAP, but Security Life claims there is only one approval and review process at Security Life called PARP.) According to Security Life, there are two steps to that process: first, Richard Lau, chief insurance risk officer for Security Life's parent company ING, issues a memorandum with a recom-

---

[2] We reject Life Plans' argument that Security Life waived this defense by failing to plead it with particularity as required by Federal Rule of Civil Procedure 9(c). Read as a whole, the answer made clear that Security Life alleged the required approval had not been obtained. See *Myers v. Central Florida Investments, Inc.*, 592 F.3d 1201, 1224 (11th Cir. 2010) (considering pleading as a whole). Even if the answer had not been sufficiently clear, the district court had discretion to allow Security Life to raise the issue, at least where there would be no unfair prejudice to Life Plans.

mendation regarding PARP approval of the policy, and second, Prakash Shimpi, an executive with titles at both Security Life and ING, makes a final decision. Security Life claims that Life Plans understood the two-step process, as evidenced by notes taken by Pamela Simon on April 27, 2011 stating: "Richard ___ next week will review PARP … then PARP goes to corporate for ok."

Security Life claims that the Peak policy failed to gain approval. Lau issued a memorandum on July 22, 2011 saying that the Peak policy "involves significant new risks" and "cannot be recommended for sale" by his office, and that "approval should not be given" unless three conditions were met. Security Life contends that this memo recommended the Peak policy not be offered. Shimpi, Lau's superior, then issued a memo on August 15, 2011 stating that his office fully supported the Lau recommendation expressing "concerns of business risks associated with the single broker." Security Life argues that Shimpi's signature on a pricing memorandum was needed for PARP approval, and that Shimpi's disapproval in that memo doomed the Peak policy and thus the agreement with Life Plans before it ever got off the ground. (Pricing Memorandum dated May 5, 2011 with no signatures.)

Life Plans denies that the agreement referred to that two-step process. Life Plans counters with sworn testimony from David Simon that representatives from Security Life told him in December 2010 that PARP was "an individual or a group of individuals who were deciding what the premium needs of Security Life of Denver were." Pam Simon testified that those same Security Life representatives told her and her husband David that PARP would be completed before

the agreement was signed. (Such testimony about admissions by representatives of the opposing party is not hearsay but is admissible under Federal Rule of Evidence 801(d)(2).) According to both Simons' testimony, PARP was not a part of the agreement or related to the Product Review and Approval Process mentioned as a condition precedent. Life Plans also argues that the Product Review and Approval Process referred to in the agreement was satisfied because a Security Life employee admitted the Peak policy was approved by Security Life's "contract review team" by January 12, 2011.

In the alternative, Life Plans argues that even if the Product Review and Approval Process mentioned in the agreement was a reference to the two-step PARP, the condition was satisfied because there is evidence that the Peak policy actually received PARP approval, despite Security Life's denials. Life Plans contends that an earlier memo from Lau dated June 7, 2011 approved the Peak policy. That memo said that Security Life "would not recommend approval" without three conditions being met, but all three were in fact later satisfied. One executive for ING testified that he understood that double negative to mean that Lau would approve the Peak policy if the conditions were met. Life Plans also disputes that Shimpi refused to sign the pricing memorandum and therefore rejected PARP approval for the Peak policy because Shimpi said in his deposition that a different review process—for minimum standards rather than the pricing memorandum—was the PARP. Finally, Life Plans claims that Security Life's chief executive officer, Bruce Britton, gave PARP approval to the Peak policy. Britton testified that he signed the pricing memorandum.

The voluminous evidence on these matters, which we have sharply condensed here, presents genuine disputes of material fact that make summary judgment inappropriate. Life Plans and Security Life presented conflicting evidence over (a) what the Product Review and Approval Process required, (b) whether that was a reference to PARP, (c) what PARP is, and (d) whether the Peak policy received whatever approval was required by the agreement. It will be up to a jury to weigh this conflicting evidence and to decide whether the condition precedent was satisfied. On this evidence, a reasonable jury could return a verdict for either side. Neither is entitled to summary judgment.

## 2. *Processing of Pending Applications*

Life Plans also challenges the district court's grant of summary judgment for Security Life on the second theory of a breach of contract: even if the agreement permitted the termination, Security Life violated the contract by failing to process Peak applications that were already pending when it gave notice of termination. The termination clause provided: "Company will complete processing of all applications received prior to notice of termination." Security Life admits this clause required it to process applications pending before termination but argues that no applications for the Peak policy were pending when it gave notice of termination.

This claim has an unusual procedural history. The parties' cross-motions for summary judgment addressed the primary breach of contract claim regarding Security Life's three-year term of commitment. In response to Security Life's motion, Life Plans argued that the purported termination was ineffective because Security Life had not processed pending applications. The district court rejected this argu-

ment and commented in a footnote: "Whether or not LPI has an *independent* breach of contract claim against SLD solely for an alleged failure to complete processing of 'all applications received prior to notice of termination' is not discussed by the parties." (Emphasis added.) The district court granted full summary judgment for Security Life and terminated the case.

Life Plans then moved to alter that judgment, arguing that the parties simply had not addressed the pending application issue in their summary judgment briefing and that summary judgment was improper because there were disputed issues of material fact. Security Life replied that Life Plan had abandoned the pending application claim *by failing to move for summary judgment!* The district court denied the motion to alter, agreeing that Life Plans had indeed abandoned the claim. The district court reasoned: "It was up to LPI to set forth any and all bases for relief it was seeking, including the position that even if SLD properly terminated the contract, LPI was still entitled to damages for SLD's failure to process applications it had received at the time of termination."

Since the Supreme Court's 1986 summary judgment trilogy,[3] the role of summary judgment in federal civil practice has expanded significantly. Lawyers even joke that in some types of cases, it's malpractice for a defense attorney not to move for summary judgment. Things have not, however, reached the point that a party can fairly be deemed to have

---

[3] *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

waived or forfeited a claim or defense by failing to move for summary judgment on it. Security Life moved for judgment on Life Plans' breach of contract claim, arguing failure of a condition precedent and lawful termination, but scarcely addressed possible liability for pending applications. Life Plans might have avoided the district court's premature resolution of this claim by stating more clearly in its briefing that it intended to proceed with this claim even if the court granted summary judgment for Security Life on the three-year commitment theory. But its failure to do so did not abandon this claim.

Turning to the merits of the issue, there is a genuine dispute of material fact as to whether any applications were pending when Security Life gave notice. Security Life says no because the Peak policy was never offered. Life Plans counters that it submitted dozens of applications, at least nine of which were approved by Security Life and for which underwriting was completed. And Life Plans offers evidence that Britton, Security Life's CEO, admitted that there were insureds who were "medically underwritten and approved, so we should be issuing them a PEAK policy." A reasonable jury could find for Life Plans based on this evidence.

B. *Implied Covenant of Good Faith*

Life Plans also brought a distinct claim under Delaware law alleging that Security Life breached the implied covenant of good faith and fair dealing in abusing its discretion to approve the Peak policy under its Product Review and Approval Process. The district court granted summary judgment on this claim because it found that Security Life's termination was an exercise of a right expressly provided in the agreement. Having found a genuine dispute as to a ma-

terial fact regarding the termination, we re-evaluate the implied covenant claim.

Delaware recognizes a claim for the breach of the implied covenant of good faith and fair dealing in limited circumstances. The implied covenant requires "'a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits' of the bargain." *Dunlap v. State Farm Fire & Casualty Ins. Co.*, 878 A.2d 434, 442 (Del. 2005), quoting *Wilgus v. Salt Pond Investment Co.*, 498 A.2d 151, 159 (Del. Ch. 1985). The covenant implies terms in an agreement to fill gaps or to account for unanticipated developments. *Id*.

The implied covenant cannot modify the express language of the parties' agreement, so a party generally may not base a claim of a breach of the implied covenant on conduct authorized by the terms of an agreement. *Id*. "Under Delaware law, a court confronting an implied covenant claim asks whether it is clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith—had they thought to negotiate with respect to that matter." *Gerber v. Enterprise Products Holdings, LLC*, 67 A.3d 400, 418 (Del. 2013), overruled on other grounds by *Winshall v. Viacom Int'l Inc.*, 76 A.3d 808 (Del. 2013). Finding a breach of the implied covenant "should be a rare and fact-intensive exercise, governed solely by issues of compelling fairness." *Dunlap*, 878 A.2d at 442 (brackets, footnote, citation, and internal quotation marks omitted).

Life Plans has offered evidence to show that questions of fact preclude summary judgment on this claim. A reasonable jury could find that Security Life's alleged termination was arbitrary or unreasonable and would have been proscribed if the parties had thought to negotiate with respect to this matter. Life Plans argues that Security Life acted in bad faith and treated Life Plans unfairly. Even the CEO of Security Life wrote in an internal email on September 25, 2011 to Lau and another executive that "We are not operating with integrity in this deal," trying to convince them to reverse their disapproval of PARP. CEO Britton also discussed the possibility of telling other insurance companies not to work with Life Plans in the context of addressing executives' concerns that Life Plans would just transfer the ALPS-funded policies to another insurance carrier. These comments could support a reasonable finding that Security Life's conduct breached the implied covenant.

Security Life argues that the evidence shows that it had a perfectly reasonable explanation for not offering the Peak policy: it found the exotic policy was just too risky. That may well be true, but on this record the evidence does not support summary judgment. Security Life may address its arguments about the better inferences to draw from the evidence to the jury at trial. The inferences argued by Life Plans are reasonable. That is enough to survive summary judgment.

Security Life also contends that it is entitled to summary judgment on this claim because Life Plans has not presented evidence that would show fraud, deceit, or misrepresentation, which Security Life contends is required under Delaware Law. It cites a Court of Chancery opinion stating: "The

Delaware Supreme Court has explicitly held that a claimant must demonstrate that the conduct at issue involved fraud, deceit, or misrepresentation in order to prove a breach of the implied covenant." *Continental Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1234 (Del. Ch. 2000). But the Delaware Supreme Court opinion that *Continental Insurance* cited held that an employer breaches the implied covenant in an employment contract only when the employer's conduct constitutes "an aspect of fraud, deceit or misrepresentation." *Merrill v. Crothall-American, Inc.*, 606 A.2d 96, 101 (Del. 1992) (citation and internal quotation marks omitted). That decision should not be read to apply broadly to all implied covenant claims. More recent opinions from the Delaware Supreme Court and the Court of Chancery have addressed implied covenant claims outside the employment context and have not required fraud as an element of the claim. See *Gerber*, 67 A.3d at 418–19; *Allen v. El Paso Pipeline GP Co.*, 113 A.3d 167, 183 (Del. Ch. 2014).

Finally, Security Life tries to avoid its choice of Delaware law and argues that Illinois law does not recognize an independent claim for breach of the implied covenant of good faith and fair dealing. See, e.g., *LaScola v. US Sprint Communications*, 946 F.2d 559, 565 (7th Cir. 1991) (in Illinois, obligation of good faith "is in aid of and furtherance of other terms of the agreement of the parties" and "does not create an independent cause of action"). Though Security Life agrees that Delaware law governs the rest of this dispute because of the agreement's choice-of-law provision, it challenges the application of Delaware law to this claim. It argues that the failure of the condition precedent means the agreement is unenforceable so that the provision choosing Delaware law has no effect.

That is an incorrect statement of the law. Even if one party to the contract alleges the failure of a condition precedent, we apply the law chosen by the parties to all contractual issues. *Smurfit Newsprint Corp. v. Southeast Paper Mfg. Co.*, 368 F.3d 944, 949 (7th Cir. 2004). A contract's choice-of-law provision may not apply if the contract's legality is fairly in doubt, for example, if the contract is unconscionable, or if there is some other issue as to the validity of the very formation of the contract. See *Sarnoff v. American Home Products Corp.*, 798 F.2d 1075, 1081–82 (7th Cir. 1986), abrogated on other grounds by *Hart v. Schering-Plough Corp.*, 253 F.3d 272 (7th Cir. 2001). But that concern is not present here. If Security Life is correct that a condition precedent was not satisfied, the agreement provides that it is relieved of the obligation to offer the Peak policy. That does not void the agreement's Delaware choice-of-law provision. Under Illinois choice-of-law rules, which we apply as a federal court sitting in diversity, a court must honor a contractual choice of law unless the parties' choice of law would both violate fundamental Illinois public policy and Illinois has a materially greater interest in the litigation than the chosen state. *Smurfit*, 368 F.3d at 949, citing *English Co. v. Northwest Envirocon, Inc.*, 663 N.E.2d 448, 452 (Ill. App. 1996). Security Life has never argued that exception applies here and could not show it on these facts, especially because the agreement is a commercial contract negotiated by sophisticated business parties.

III. *Denial of Leave to Amend the Complaint*

The final issue on appeal is the district court's denial of leave to amend the complaint. Life Plans sought to add two new claims: a promissory estoppel claim against Security Life and a tortious interference with contract claim against

ING U.S., Inc., Security Life's parent company. ING U.S. was not sued in the original complaint, so Life Plans' amended complaint proposed adding ING U.S. as a new defendant.

The district court denied Life Plans' motion for leave to amend because it was filed near the end of the discovery period. We review a denial of leave to amend for abuse of discretion, but we think this is one of those unusual cases where the denial was an abuse of discretion. See *Runnion v. Girl Scouts of Greater Chicago*, 786 F.3d 510, 528 (7th Cir. 2015).

The Federal Rules of Civil Procedure adopt a liberal standard for amending: "The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). The Supreme Court has interpreted this rule to require a district court to allow amendment unless there is a good reason—futility, undue delay, undue prejudice, or bad faith—for denying leave to amend. *Foman v. Davis*, 371 U.S. 178, 182 (1962).

None of those exceptions that might justify denying amendment was present in this case. Life Plans' request for amendment was timely. Life Plans sought amendment promptly after discovering a factual basis for its new claims and tried to mitigate any delay that could result from amending the complaint late in discovery. Though the district court expressed frustration because the request was made when there was only a month remaining before the deadline for completing discovery, the motion was filed promptly and would not have caused undue delay. Life Plans sought leave to amend just ten days after completing the deposition of Security Life's CEO, whose testimony showed for the first time, according to Life Plans, that termination of the agreement was forced on Security Life by ING.

Mindful of the impending discovery deadline, Life Plans told the court that it would not ask to re-depose any witnesses. And Security Life had completed only one deposition when amendment was sought, and that witness had already been asked about the amended complaint.

Granting the amendment in these circumstances would not necessarily have caused any delay, and even a modest delay would not have been undue. See *Dubicz v. Commonwealth Edison Co.*, 377 F.3d 787, 793 (7th Cir. 2004) ("[D]elay by itself is normally an insufficient reason to deny a motion for leave to amend. Delay must be coupled with some other reason … [t]ypically … prejudice to the non-moving party.") (citation omitted). The purpose of discovery is to refine the case and to prepare it for trial based on a full understanding of the relevant facts. If discovery shows that a party should be added, and if the moving party has been diligent, there may well be sound grounds for amending the pleadings and even adding a new party. Moreover, Security Life has never explained how it would be prejudiced by the amendment. Concerns about delay did not justify refusing amendment. And in light of our other rulings, we cannot say the proposed amendment would have been futile.[4]

The judgment of the district court is REVERSED and the case is REMANDED for proceedings consistent with this opinion.

---

[4] At oral argument, counsel for Life Plans moved for the reassignment of this case on remand pursuant to Circuit Rule 36. We see no reason to reassign the case and so deny the request.

Rovner, *Circuit Judge*, concurring in part and dissenting in part.

In my view, the Termination provision is not ambiguous: it granted an unfettered right to either party to terminate the agreement on thirty days' notice. Because of this conclusion, I would find that it is not necessary to address the question of whether Security Life breached the implied covenant of good faith and fair dealing when it terminated the contract. I concur in the majority's opinion on the issues of the processing of pending applications and the denial of leave to amend the complaint. In addressing the pending applications on remand, the district court likely will have to consider the issues of the condition precedent and the implied covenant of good faith and fair dealing as it relates to the failure to approve the Peak policy. On those issues, I agree with the majority's conclusion that summary judgment is inappropriate and that a trial is needed to resolve the fact questions identified in the majority opinion. But as to the termination, I respectfully dissent.

The "Commitments" clause of the contract provides, in relevant part, that Security Life "agrees to accept at least $100,000,000 of premium per twelve month period, excluding reallocations and client payments, from July 1, 2011 until June 30, 2014[.]" The "Termination" provision specifies that "[t]his Joint Cooperation Agreement will continue indefinitely, until terminated by either party upon thirty (30) days written notice, delivered by certified mail." The majority agrees that the Termination provision, standing alone, granted Security Life the right to terminate the contract at any time. *Supra* at 10. But the majority reads the "Commitments" clause as a "provision that committed the parties to a three-year term," and concludes that the seemingly conflicting provisions must be harmonized. I simply do not see any language in the

Commitments clause that binds either party to a particular term of years. Instead, the Commitments clause locks in financial terms that will govern the parties during the first three years of an indefinite relationship.

An example illustrates the distinction that I am drawing. Suppose a renter signs a month-to-month lease with a termination provision identical to the one utilized by the parties here. If the lease also contains a provision that states, "The rent shall be fixed at $1200 per month for the first twelve months," no one would argue that the month-to-month contract has been transformed into a one-year lease. The rent clause would be understood to be setting the financial terms for the first twelve months of an indefinite relationship. Likewise, using the language of the contract at issue, if the lease provides, "The renter agrees to pay $1200 per month for the first thirty-six months," it would remain a month-to-month lease, not a lease with a three-year minimum term. The rent clause, like the Commitments clause here, removes uncertainty about financial expectations but says nothing about the length of the agreement.

Purely financial terms cannot set the length of an indefinite contract. Nothing in the financial "Commitments" clause of the contract at issue here binds either party to a relationship of a definite term. The language simply commits Security Life to accepting a certain amount of premium per twelve month period for the first three years of an indefinite relationship. It would have been very easy for the parties to draft language committing them to an initial three year term. For example, they could have said that "the initial term of this agreement shall be three years, after which the agreement will continue indefinitely until either party terminates with thirty days' notice in writing." But they did not draft the contract that way;

they drafted an agreement with an indefinite term. Indeed, the contract was subject to six express conditions precedent before the deal would even commence. *See* Joint Cooperation Agreement, § 2.b (listing the conditions precedent). Because there is no conflict between the Commitments clause and the Termination provision, there is no ambiguity and no need to consider extrinsic evidence.

Neither party cited a case directly on point interpreting similar language. The majority cites no controlling case and I was also unable to find one. Security Life seems to have found the closest analogue with the decision in *Ferentinos v. Firstate Mortgage Corp.*, 1991 WL 18102 (Del. Super. Ct. 1991), *aff'd*, 608 A.2d 726 (Del. 1992). In that case, a contract provision established a five-year term of employment unless the employee died, became disabled, or was terminated for cause. Another clause stated that the employer "may elect to terminate this agreement without cause at any time" by paying the smaller of one years' salary or the balance due on the unexpired term of employment. The court found no ambiguity in those provisions, even though one stated a fixed term for the contract and the other purported to allow termination at any time.

The case is even stronger here, where there is no provision setting a particular length of time for the contract, and where the only duration-related provision states that the agreement is indefinite. As is apparent from the briefs, the agreement never really got off the ground and at best there may be some partial performance issues to be resolved. Because the contract granted either party an unlimited right to terminate the agreement on thirty days' notice, I would affirm the district court's grant of summary judgment in favor of Security Life on the issue of termination. I agree that the case must be re-

manded, however, because there are open questions of fact regarding pending applications and because the district court should have allowed Life Plans to amend its complaint. In my view, the only issues for trial relate to partial performance during the four months that the agreement was in effect.