# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BALLARD CONCRETE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No.: N25C-06-142 FJJ |
| v. | ) | |
| | ) | |
| CDE GLOBAL, ID, | ) | |
| | ) | |
| Defendants. | ) | |

Submitted: October 21, 2025
Decided: November 3, 2025

## OPINION AND ORDER
### *On Defendant's Motion to Dismiss Plaintiff's Complaint*

### GRANTED, in part, and DENIED, in part.

*William B. Larson, Esquire* and *Jalen S. Frantal, Esquire,* Manning Gross & Massenburg, LLP, Wilmington, Delaware, *Attorneys for Plaintiff.*

*Elizabeth S. Fenton, Esquire* and *Brittany M. Giusini Tsoflias, Esquire,* Barnes & Thornburg, LLP, Wilmington, Delaware, *Attorneys for Defendant.*

**Jones, J.**

Ballard Concrete, LLC ("Ballard" or "Plaintiff") is an Alabama limited liability company with a principal place of business is located in Alabama.[1] CDE Global ("CDE" or "Defendant") is a Delaware Corporation with a principal place of business is located in Texas.[2]  In late 2022, the parties engaged in negotiations surrounding a custom sand and gravel plant ("Plant") CDE would build for Ballard.[3] The parties ultimately entered into a contract for CDE to build Ballard the Plant. Work commenced and problems arose between the parties.  This lawsuit follows.

In the Complaint filed with this court on June 12, 2025, Ballard asserted the following claims against CDE: 1) fraudulent inducement; 2) fraudulent misrepresentation; 3) breach of contract; 4) breach of the implied covenant of good faith and fair dealing; 5) breach of express warranty (6 *Del. C.* §2-313); 6) breach of implied warranty of merchantability (6 *Del. C.* §2-314); 7) breach of the implied warranty of fitness for a particular purpose (6 *Del. C.* §2-315); 8) anticipatory repudiation; and 9) a declaratory judgement.[4] Ballard further alleges damages of at least $5,168,650.56, with additional damages of $25,890 being incurred each

---

[1] Docket Item ("D.I.") 1, ¶ 1.
[2] D.I. 1, ¶ 2.
[3] D.I. 1, ¶ 6; D.I. 10, p. 2.
[4] *See generally* D.I. 1.

day.[5] In response, CDE filed a motion to dismiss claims I, II, IV, VI, VII, VIII, and IX on August 8, 2024.[6] This is the Court's decision on that motion.

## STANDARD OF REVIEW

When reviewing a Motion to Dismiss under Superior Court Rule 12(b)(6), the Court (1) accepts all well-plead factual allegations as true, (2) accepts even vague allegations as well-plead if they give the opposing party notice of the claim, (3) draws all reasonable inferences in favor of the non-moving party, and (4) only dismisses a case where the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[7] "Dismissal is warranted where the plaintiff has failed to plead facts supporting an element of the claim, or that under no reasonable interpretation of the facts alleged could the complaint state a claim for which relief might be granted."[8]

## FACTUAL AND PROCEDURAL OVERVIEW

When the facts are taken from the Complaint, viewed in a light most favorable to Ballard, they reveal the following.

In late 2022, the parties engaged in negotiations surrounding a custom sand and gravel plant ("Plant") CDE would build for Ballard.[9] The rough price estimate

---

[5] D.I. 1, ¶ 107-108, 176.
[6] *See generally* D.I. 10.
[7] *ET Aggregator, LLC v. PFJE Asset Co Holdings LLC*, 2023 WL 8535181, at *6 (Del. Super. Ct. Dec. 8, 2023).
[8] *Hedenberg v. Raber*, 2004 WL 2191164, at *1 (Del. Super. Ct. Aug. 20, 2004).
[9] D.I. 1, ¶ 6; D.I. 10, p. 2.

3

was provided by Defendant on February 9, 2023.[10] After multiple meetings and discussions as to price and expectations, on March 12, 2023, the parties agreed on a price of $2,026,450.00 for the design, shipment, and installation of the custom Plant.[11] The Order Agreement ("OA"), which outlined warranties, payment dates, and building timelines, was reviewed and signed by Ballard's President on March 24, 2023.[12]

On March 31, 2024, Ballard paid the initial 30% deposit ($607,935.00) as required by the OA.[13] On October 31, 2023, Ballard paid another 20% of the price ($419,477.05) to "facilitate the start of Final Assembly and Testing of Products."[14] In December of 2023 and January of 2024, disagreements arose as to the fulfillments of the parties' duties in relation to product delivery and payment.[15] To resolve these disputes, the parties agreed to amend the original OA and payment structure (hereinafter referred to as the "Resolution") on January 24, 2024, supplementing it with new delivery dates and letters of credit that would be released upon successful delivery and assembly of the Plant and it's parts.[16] The Resolution also required Ballard to pay another 30% ($668,937.27) immediately,

---

[10] D.I. 1, ¶ 9; D.I. 10, p. 2.
[11] D.I. 1, ¶ 9-16; D.I. 10, p. 2-3.
[12] D.I. 1, ¶ 16-20; D.I. 10, p. 3.
[13] D.I. 1, ¶ 21; D.I. 10, p. 3.
[14] D.I. 1, ¶ 24; D.I. 10, p. 3.
[15] D.I. 1, ¶ 21-31; D.I. 10, p. 3.
[16] D.I. 1, ¶ 34; D.I. 10, p. 3-4.

which it paid on the same day.[17] Pursuant to the Resolution, after the first shipment arrived on February 11, 2024, Ballard signed and executed two letters of credit to CDE on April 27, 2024, valued at $327,436.20 and $109,145.40, respectively.[18] A second shipment was completed on July 2, 2024, and a third followed on July 8, 2024.[19]

With the completion of these shipments, CDE executed, and received payment of, the first letter of credit ($327,436.20).[20] Issues arose with the construction of the Plant from August to October of 2024.[21] CDE commissioned the Plant on September 30, 2024.[22] The final shipment of parts for construction were delivered on October 20, 2024.[23] On October 21, 2024, CDE sent Ballard a "Commissioning Report" noting the completion and commission of the Plant.[24] Disagreements ensued regarding the payment of the final letter of credit, the final outstanding amount under the OA, totaling $109,145.40.[25]

Ballard sent a demand letter to CDE outlining issues with the Plant, contractual disputes, and other claims on November 1, 2024.[26]

---

[17] D.I. 1, ¶ 35; D.I. 10, p. 3-4.
[18] D.I. 1, ¶ 36-43; D.I. 10, p. 3-4.
[19] D.I. 1, ¶ 45, 47; D.I. 10, p. 4.
[20] D.I. 1, ¶ 51-53; D.I. 10, p. 4.
[21] D.I. 1, ¶ 48-65; D.I. 10, p. 4.
[22] D.I. 1, ¶ 58, 65, 72; D.I. 10, p. 4.
[23] D.I. 1, ¶ 65, 68; D.I. 10, p. 4.
[24] D.I. 1, ¶ 71-72; D.I. 10, p. 4.
[25] D.I. 1, ¶ 74; D.I. 10, p. 4.
[26] D.I. 1, ¶ 79; *see also* Exhibit G.

## ANALYSIS

I.    <u>Count I and Count II, the Fraudulent Inducement and Fraudulent Misrepresentation Claims, Meet the Pleading Requirements</u>.

In Counts I, II, and III, Plaintiff asserts claims of fraudulent inducement, fraudulent misrepresentation, and breach of contract, respectively.[27] Count I, the fraudulent inducement claim, is based on alleged statements defendant made regarding the processing capabilities of the Plant and the support CDE would provide to Ballard.[28] Count II, fraudulent misrepresentation, again raises the issue of the Plant's processing power, in addition to alleged misrepresentations about when the Plant would be completed, the support and warranty services Ballard would receive, and the Plant's compliance with regulatory standards.[29] Defendant argues the first two counts should be dismissed because: 1) they are not plead with the required particularity;  2) they are duplicative under the economic loss doctrine;  and 3) the claims rely on alleged extracontractual statements.[30]

*A. Required Particularity.*

I first address whether the claims meet the requirements of Superior Court Rule 9(b).  A fraudulent inducement claims must state five allegations:

> To state a claim for fraudulent inducement, a plaintiff
> must allege: "(1) the defendant falsely represented or
> omitted facts that the defendant had a duty to disclose;

---

[27] D. I. 1, p. 31-33.
[28] D. I. 1, ¶ 109-115.
[29] D. I. 1, ¶ 116-122.
[30] D.I. 10, p. 5-8.

6

(2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance."[31]

To meet the factual requirements of this particularity standard, "a complaint must allege: (1) the time, place, and contents of the false representation; (2) the identity of the person making the representation; and (3) what the person intended to gain by making the representations."[32] "While knowledge may be pled generally, when a plaintiff pleads a claim of fraud that charges that the defendants knew something, it must allege sufficient facts from which it can reasonably be inferred that this 'something' was knowable and that the defendants were in a position to know it."[33] "However, Delaware courts have held that lack of specificity as to date, place, and time are not fatal, *provided that* the pleadings put defendants on sufficient notice of the actual misconduct with which they are charged."[34]

When asserting fraudulent inducement claims alongside breach of contract claims, the plaintiff must plead separate damages; the "fraud damages allegations can't simply 'rehash' the damages that were allegedly caused by the claimed

---

[31] *Abbott Labs. v. Owens*, 2014 WL 8407613, at *8 (Del. Super. Ct. Sept. 15, 2014) (quoting *Lord v. Souder*, 748 A.2d 393, 402 (Del. 2000)).

[32] *Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006) (citing *H–M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 145 (Del. Ch. 2003)).

[33] *Id.*

[34] *Kainos Evolve, Inc. v. InTouch Techs., Inc.*, 2019 WL 7373796, at *4 (Del. Ch. Dec. 31, 2019) (quoting *LVI Grp. Invs., LLC v. NCM Grp. Holdings, LLC*, 2017 WL 1174438, at *4 (Del. Ch. Mar. 29, 2017)).

breach of contract."[35] "Failure to plead separate damages is an independent ground for dismissal."[36]

The Complaint alleges multiple conversations took place between the parties, including a Plant walkthrough, before the OA was signed on March 12, 2023.[37] The Complaint points to a specific meeting when false statements were allegedly made as to the processing power of the plant.[38] Specifically, Ballard highlights a meeting with "CDE's Vice President of Sales in North America, Mr. Joe Teague, as well as CDE's Gustavo Brasil, at Ballard's office in Moundville, Alabama" where representations were made that "the Plant would be able to process two hundred (200) tons per hour ("TPH") of raw feed material."[39] This is further memorialized in both the proposed OA, and the official OA.[40] Ballard further asserts "CDE knowingly made false misrepresentations regarding: (1) its ability to deliver a Plant with 200 TPH of throughput processing capacity, despite internal engineering documents showing this was technically impossible with the designed Products."[41] These pleadings satisfy the fraud particularity standard

---

[35] *EZLinks Golf, LLC v. PCMS Datafit, Inc.*, 2017 WL 1312209, at *7 (Del. Super. Ct. Mar. 13, 2017) (quoting *Cornell Glasgow, LLC v. La Grange Props., LLC*, 2012 WL 2106945, at *8 (Del. Super. Ct. June 6, 2012)); *see also Firmenich Inc. v. Nat. Flavors, Inc.*, 2020 WL 1816191, at *5 (Del. Super. Ct. Apr. 7, 2020).
[36] *EZLinks Golf*, 2017 WL 1312209, at *6 (citing *Cornell Glasgow*, 2012 WL 2106945, at *8).
[37] D.I. 1, ¶ 9-16.
[38] *Id.* at ¶ 13-14.
[39] D.I. 1, ¶ 13-14.
[40] Exhibit B, p. 8; Exhibit C, p. 10.
[41] D.I. 1, ¶ 117.

required for Counts I and II of the complaint as they sufficiently put CDE on notice of the specific misconduct with which they are charged.

Defendant maintains that because the Counts I and II allege the same damages as Count III, Counts I and II should be dismissed. Not so.

In *Firmenich Inc. v. Nat. Flavors, Inc.*, this Court undertook an examination of previous cases to determine "whether or not fraud damages can be distinguished from breach of contract damages on the basis of the actual method of calculation, or whether the difference in actual recoverable damages constitutes a legal distinction."[42] The court summarized its findings below:

> Having reviewed the relevant case law, the Court is unable to construct a seamless trail of legal analysis on this narrow issue.
>
> *ABRY* supports the conclusion that a contractual limitation on damages opens the door to parallel breach of contract and fraud claims. The Court of Chancery cited concern with the proposition that a seller could contractually prevent rescission in the face of fraudulent inducement. However, the APA in this case does not bar rescission.
>
> In *JCM*, the Court declined to dismiss the fraud claim on the basis of duplicative damages. However, the *JCM* analysis was limited to the bootstrapping bar as it applies to claims arising from obligations outside the contract.
>
> *ITW* and *Novipax* support the proposition that rescissory damages based on a fraud claim are distinguishable from breach of contract damages.

---

[42] *Firmenich Inc. v. Nat. Flavors, Inc.*, 2020 WL 1816191, at *10 (Del. Super. Ct. Apr. 7, 2020).

Finally, the *EZLinks* plaintiff pled neither rescission nor rescissory damages.[43]

Further, the Delaware Court of Chancery in *Kainos Evolve, Inc. v. InTouch Technologies, Inc.* recognized that the measure of fraud damages can differ from breach of contract damages, even when they are based on the same conduct, due to public policy concerns against fraud.[44] And, as the Delaware Supreme Court has noted, "[t]he scope of fraud damages is broad."[45]

The complaint in Count I and II alleges a specific dollar amount "as well as … additional amounts to be determined at trial."[46] In addition to this language, the contract between the parties contains a provision capping the damages under the contract. Specifically, Section 13 of the General Terms and Conditions caps damages for breach of contract claims at 100% of the contract price.[47] Conversely, the document mentions there is no such cap for fraud or fraudulent misrepresentation damages.[48] Thus, it is possible that the breach of contract and fraud damages will differ in the present case. The existence of the contractual limitation language and the "additional amounts" language in the complaint is

---

[43] *Id.*; *but see EZLinks Golf*, 2017 WL 1312209, at *7 ("*JCM* hardly stands for the proposition that identical damages claims in breach-of-contract and fraudulent-inducement counts are permissible and allow both counts to coexist in one action.").

[44] *Kainos Evolve, Inc. v. InTouch Techs., Inc.*, 2019 WL 7373796, at *3 (Del. Ch. Dec. 31, 2019).

[45] *LCT Cap., LLC v. NGL Energy Partners LP*, 249 A.3d 77, 91 (Del. 2021).

[46] D.I. 1, p. 32-34

[47] Exhibit A, Section 13.1.

[48] *Id.* at Section 13.2.

10

sufficient for plaintiff to climb over the "same damages" argument made by the defendant.

### B. The Economic Loss Doctrine.

Delaware has recognized the economic loss doctrine which "prohibits certain claims in tort where overlapping claims based in contract adequately address the injury alleged."[49] Thus, it "prohibits recovery in tort where a product damages only itself, that is, 'it has not caused personal injury or damage to *other property*, and the only losses suffered are economic in nature. Economic loss is defined as monetary loss, costs of repair or replacement, … [or] loss of business.'"[50] "The economic loss rule is especially suited to situations where privity of contract exists."[51] "The threshold issue for determining whether the economic loss doctrine applies is whether the [defendant] breached a duty independent of its contractual obligations."[52] "[I]f the claim is not based on an independent duty, then the non-contractual claim cannot survive."[53] "Essentially, a fraud claim alleged contemporaneously with a breach of contract claim may

---

[49] *Abbott*, 2014 WL 8407613, at *7 (Del. Super. Ct. Sept. 15, 2014) (citing *Brasby v. Morris*, 2007 WL 949485, at *6 (Del. Super. Ct. Mar. 29, 2007)) (also citing *Danforth v. Acorn Structures, Inc.*, 608 A.2d 1194, 1195 (Del. 1992)).

[50] *Gea Sys. N. Am. LLC v. Golden State Foods Corp.*, 2020 WL 3047207, at *7 (Del. Super. Ct. June 8, 2020) (quoting *Sycamore Farms, Inc. v. Barnes Elec., Inc.*, 2011 WL 5330621, at *1 (Del. Super. Ct. Oct. 20, 2011) (emphasis added)).

[51] *Brasby v. Morris*, 2007 WL 949485, at *7 (Del. Super. Ct. Mar. 29, 2007) (citing *Danforth*, 608 A.2d at 1200).

[52] *Gea Sys.*, 2020 WL 3047207, at *7 (quoting *Sycamore Farms*, 2011 WL 5330621, at *1).

[53] *Wohlsen Constr. Co. v. Berkel & Co. Contractors*, 2025 WL 2306140, at *3 (Del. Super. Ct. Aug. 11, 2025).

11

survive, so long as the claim is based on conduct that is separate and distinct from the conduct constituting breach."[54]

However, claims for fraud are not always prohibited by the economic loss doctrine.[55] "Allegations of fraud that go directly to the inducement of the contract, rather than its performance, would present a viable claim," as the claim would be based on an independent duty arising outside of the contract.[56] Delaware courts have noted that the timing of the alleged fraudulent statements, whether before or after the signing of the contract, are of great importance in making fraudulent inducement determinations.[57] When the statements or actions occurred are indicative of whether the alleged fraudulent actions went to the inducement of the contract or its performance.[58]

Delaware courts have also made it clear that misrepresentations within a contract itself will allow a fraud claim to survive alongside a breach of contract claim. The court in *Levy Fam. Invs., LLC v. Oars + Alps LLC* laid out the circumstances in which fraud claim can survive with a breach of contract claim:

> Thus, the anti-bootstrapping rule does not prevent
> parties from bringing a fraud claim if (1) the plaintiff
> alleges the seller knowingly made false contractual

---

[54] *Ashland LLC v. Samuel J. Heyman 1981 Continuing Tr. for Heyman*, 2018 WL 3084975, at *14 (Del. Super. Ct. June 21, 2018) (quoting *Furnari v. Wallpang, Inc.*, 2014 WL 1678419, at *8 (Del. Super. Ct. Apr. 16, 2014)).

[55] *Abbott*, 2014 WL 8407613, at *7 (citing *Brasby*, 2007 WL 949485, at *7).

[56] *Id.* at *7 (citing *Brasby*, 2007 WL 949485, at *7); *see also Gea Sys.*, 2020 WL 3047207, at *8.

[57] *EZLinks Golf, LLC v. PCMS Datafit, Inc.*, 2017 WL 1312209, at *5 (Del. Super. Ct. Mar. 13, 2017); *see also Brasby*, 2007 WL 949485, at *8; *see also Abbott*, 2014 WL 8407613, at *9.

[58] *EZLinks Golf*, 2017 WL 1312209, at *5; *see also Brasby*, 2007 WL 949485, at *8; *see also Ashland*, 2018 WL 3084975, at *14.

representations, (2) "damages for plaintiff's fraud claim may be different from plaintiff's breach of contract claim," (3) "the conduct occurs prior to the execution of the contract 'and thus with the goal of inducing the plaintiff's signature and willingness to close on the transaction,'" **or** (4) "the breach of contract claim is not well-pled such that there is no breach claim on which to 'bootstrap' the fraud claim."[59]

The "or" at the end of this list is of the utmost importance. If any of these situations are found to exist in the present case, the associated fraud claim must be allowed to proceed, assuming it meets the other requirements.

Plaintiff has alleged that prior to the contract being formed CDE knowingly made false representations in a number of key respects.[60] During oral argument, Plaintiff clarified it is their allegation that CDE's engineering report finding they could not construct a Plant with the negotiated upon processing power (200 TPH) came into being before the signing of the contract.[61] Further, Ballard asserts the OA contains false contractual representations that the Plant would be able to process 200 TPH, despite the engineer report clearly showing otherwise.[62] These allegations are enough to satisfy *Levy* situations (3) and (1), respectively.

Additionally, plaintiff has pled alternative theories of recovery. Delaware law recognizes that a fraud claim, when pled in the alternative, can survive

---

[59] *Levy Fam. Invs., LLC v. Oars + Alps LLC*, 2022 WL 245543, at *8 (Del. Ch. Jan. 27, 2022) (internal citations omitted) (emphasis added); *see also CoVenture - Burt Credit Opportunities GP, LLC v. Coleman*, 2023 WL 7179488, at *7 (Del. Super. Ct. Nov. 1, 2023).

[60] D.I. 1, ¶ 110-111, 117.

[61] *See also* D.I. 1, ¶ 117.

[62] D.I. 1, ¶ 117-122.

alongside a breach of contract claim.[63] "In *Ashland*, this Court held that duplicative damages will not bar parallel breach of contract and fraud in the inducement claims if the claims are pled in the alternative."[64] The court reasoned when "the claims are pleaded in the alternative, the claims would never co-exist at final judgment and are, therefore, not duplicative."[65] As a result, the damages would not "rehash" each other, despite their similarities.[66]

Under three of the circumstances outlined in *Levy*, the complaint is sufficient to establish the exceptions to the economic loss doctrine allowing the case to proceed.

### C. Extra Contractual Statements and Anti-Reliance Clauses.

As a separate ground to dismiss Counts I and II, CDE claims that Ballard is relying on extracontractual statements which it is not permitted to do. CDE points to Section 16.1 of the General Terms and Conditions: "EACH PARTY ACKNOWLEDGES THAT IN ENTERING INTO THE CONTRACT IT DOES NOT RELY ON, AND SHALL HAVE NO REMEDIES IN RESPECT OF, ANY STATEMENT, REPRESENTATION, ASSURANCE OR WARRANTY

---

[63] *Firmenich*, 2020 WL 1816191, at *9; *Ashland*, 2018 WL 3084975, at *14-15.
[64] *Firmenich*, 2020 WL 1816191, at *9 (citing *Ashland*, 2018 WL 3084975, at *14-15).
[65] *Ashland*, 2018 WL 3084975, at *15 (internal quotation marks omitted).
[66] *Firmenich*, 2020 WL 1816191, at *9.

(WHETHER MADE INNOCENTLY OR NEGLIGENTLY) THAT IS NOT SET OUT IN THE CONTRACT."[67]

"Because of Delaware's strong public policy against intentional fraud, a knowingly false contractual representation can form the basis for a fraud claim, regardless of the degree to which the agreement purports to disclaim or eliminate tort remedies."[68] "Delaware law permits sophisticated commercial parties to craft contracts that insulate a seller from a rescission claim for a contractual false statement of fact that was not intentionally made."[69] "But the contractual freedom to immunize a seller from liability for a false contractual statement of fact ends there."[70] "When a seller intentionally misrepresents a fact embodied in a contract—that is, when a seller lies—public policy will not permit a contractual provision to limit the remedy of the buyer to a capped damage claim."[71]

Anti-reliance or integration clauses are one way in which parties' contracts can limit a seller's liability. Delaware courts have been clear that these clauses must contain unambiguous language to be enforceable:

> [W]e have not given effect to so-called merger or integration clauses that do not clearly state that the parties disclaim reliance upon extra-contractual statements. Instead, we have held, as in *Kronenberg*, that murky integration clauses, or standard integration

---

[67] Exhibit A, Section 16.1.

[68] *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 136–37 (Del. Ch. 2009).

[69] *Abry*, 891 A.2d at 1035.

[70] *Id.*

[71] *Id.* at 1036.

clauses without explicit anti-reliance representations, will not relieve a party of its oral and extra-contractual fraudulent representations. The integration clause must contain "language that ... can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract." … If parties fail to include unambiguous anti-reliance language, they will not be able to escape responsibility for their own fraudulent representations made outside of the agreement's four corners.[72]

Importantly, whether the disclaimer is ambiguous is considered from the point of view of the "aggrieved party" asserting the fraud claim.[73] Despite this exception, courts have "consistently h[eld] that sophisticated parties to negotiated commercial contracts may not reasonably rely on information that they contractually agreed did not form a part of the basis for their decision to contract."[74]

Here, the anti-reliance clause in Section 16.1 does not disclaim reliance on extra-contractual fraudulent statements. This is evidenced by the fact that section 16.1 only disclaims reliance on "statement[s], representation[s], assurance[s] or warrant[ies]" that are made "innocently or negligently." 16.1 does not disclaim

[72] *Abry*, 891 A.2d at 1058–59 (quoting *Kronenberg v. Katz*, 872 A.2d 568, 593 (Del. Ch. 2004)); *see also Kainos*, 2019 WL 7373796, at *3; *see also FdG Logistics LLC v. A&R Logistics Holdings, Inc.*, 131 A.3d 842, 860 (Del. Ch.), *aff'd sub nom. A & R Logistics Holdings, Inc. v. FdG Logistics LLC*, 148 A.3d 1171 (Del. 2016) (noting "[a]s explained in *Abry*, the Court will not bar a contracting party from asserting claims for fraud based on representations outside the four corners of the agreement unless that contracting party unambiguously disclaims reliance on such statements.").

[73] *Kainos*, 2019 WL 7373796, at *3 (quoting *FdG Logistics*, 131 A.3d at 860).

[74] *Abry*, 891 A.2d at 1057 (quoting *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 142, n.18 (Del. Ch. 2003)).

reliance on fraudulent statements or representations.[75] Therefore, Ballard is not barred by Section 16.1 from pleading a claim for fraudulent inducement based on extra-contractual representations.

Ballard has also pled in paragraph 117 that there is a CDE internal engineering document that existed during negotiations over the contract which is inconsistent with the precontractual representations made by CDE as to the production capabilities of the plant.[76] This allegation further bolsters Ballard's claim and is sufficient to pass over the extracontractual statement issue raised by the defendant.

For the aforementioned reasons, the motion to dismiss Counts I and II are **DENIED**.

II.   Count IV, the Implied Covenant of Good Faith Claim, Does Not Meet Pleading Requirements.

In Count IV, plaintiff asserts a claim of breach of the implied covenant of good faith and fair dealing under.[77] Specifically, plaintiff points to a host of actions it alleges broke this covenant, including: 1) "[a]ggressively demanding full payment while knowingly delivering defective Products and an inoperable Plant

---

[75] If a writing is clear and unambiguous, the court will rely solely on the language of the contract. *See Am. Healthcare Admin. Servs., Inc. v. Aizen*, 285 A.3d 461, 475 (Del. Ch. 2002); *see e.g., Express Scripts, Inc. v. Bracket Holdings Corp.*, 248 A.3d 824, 831–32 (Del. 2021) ("A plain reading of the SPA shows that the parties took great care to distinguish between deliberate fraud and other states of mind and conduct. If the defendants committed deliberate fraud, Bracket could recover damages.").
[76] D.I. 1, ¶ 117.
[77] D.I. 1, p. 34-36.

that could not meet specification and performance standards;" 2) "[r]efusing to honor warranty obligations despite documented issues and violations;" and 3) "[i]ntentionally withholding software support in order to force Ballard to make payments."[78] Defendant responds that the claim is duplicative of the breach of contract claim and not actionable.[79] Accordingly, defense argues Count IV should be dismissed.[80]

"Under Delaware law, an implied covenant of good faith and fair dealing inheres in every contract."[81] "As such, a party to a contract has made an implied covenant to interpret and to act reasonably upon contractual language that is on its face reasonable."[82] "The covenant is 'best understood as a way of implying terms in the agreement.'"[83] "The implied covenant requires 'a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits' of the bargain."[84] "When a contract confers discretion on one party, the implied covenant requires that the discretion be used reasonably and in good faith."[85] "Thus, parties

---

[78] D.I. 1, ¶ 131.
[79] D.I. 10, p. 8.
[80] *Id.*
[81] *Chamison v. HealthTrust--Hosp. Co.*, 735 A.2d 912, 920 (Del. Ch. 1999), *aff'd*, 748 A.2d 407 (Del. 2000) (citing *Wilgus v. Salt Pond Inv. Co.*, 498 A.2d 151, 159 (Del. Ch. 1985)); *see also* 6 *Del. C.* 1-304 ("Every contract or duty within the Uniform Commercial Code imposes an obligation of good faith in its performance and enforcement.").
[82] *Chamison*, 735 A.2d at 920 (citing *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1055 (Del. Ch. 1984), *aff'd*, 575 A.2d 1131 (Del. 1990)).
[83] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) (quoting *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 443 (Del. 1996)).
[84] *Id.* at 442 (quoting *Wilgus v. Salt Pond Inv. Co.*, 498 A.2d 151, 159 (Del.Ch.1985)).
[85] *Airborne Health*, 984 A.2d at 146–47.

are liable for breaching the covenant when their conduct frustrates the 'overarching purpose' of the contract by taking advantage of their position to control implementation of the agreement's terms."[86] However, this "covenant is a limited and extraordinary legal remedy"[87] that is "recognized only where a contract is silent as to the issue in dispute."[88]

To state a claim that a party breached the implied covenant of good faith and fair dealing, a party must allege three elements: "'[1] a specific **implied** contractual obligation, [2] a breach of that obligation by the defendant, and [3] resulting damage to the plaintiff.'"[89] Due to the implied nature of the claim, to state a cognizable claim a "plaintiff must allege a *specific implied contractual obligation* and allege how the violation of that obligation denied the plaintiff the fruits of the contract."[90] Accordingly, the plaintiff "cannot bootstrap their breach of contract claim into an implied covenant claim merely by adding allegations about the Buyers' state of mind when they breached the contract."[91]

Plaintiff asserts that because of the alleged discretion the agreement afforded the defendant, these claims should survive.[92] Specifically, plaintiff

---

[86] *Id.* (quoting *Breakaway Sols., Inc. v. Morgan Stanley & Co. Inc.*, 2004 WL 1949300, at *12 (Del. Ch. Aug. 27, 2004), *amended*, 2005 WL 3488497 (Del. Ch. Dec. 8, 2005)).

[87] *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010).

[88] *AQSR India Priv., Ltd. v. Bureau Veritas Holdings, Inc.*, 2009 WL 1707910, at *11 (Del. Ch. June 16, 2009) (citing *In re IAC/InterActive Corp.*, 948 A.2d 471, 506 (Del. Ch. 2008)).

[89] *Kelly v. Blum*, 2010 WL 629850, at *13 (Del. Ch. Feb. 24, 2010) (quoting *Cantor Fitzgerald, L.P. v. Cantor, et al.*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998)) (emphasis added).

[90] *Id.*

[91] *AQSR*, 2009 WL 1707910, at *11.

[92] D.I. 16, p. 6-7.

19

highlights sections 4.1 and 4.5 of the Warranty Terms and Conditions document, and sections 4.5, 5.1, 6.2, and 7.1 of the General Terms and Conditions.[93] However, due to the similarity between the breach of contract claims and the implied covenant claims, the express language of the contract addressing the actions involved, and the extraordinary nature of a breach of the implied covenant claim, the Court disagrees.

Paragraphs 125 and 131 of the Complaint lay out the grounds for the breach of contract claim and the breach of the implied covenant claim, respectively.[94] Many of these allegations are quite similar. For example, under the breach of contract claim in paragraph 125, the seventh ground listed accuses CDE of "refusing to honor its warranty obligations when Products failed."[95] Similarly, part C of paragraph 131 states CDE breached their duty of good faith by "[r]efusing to honor warranty obligations despite documented issues and violations."[96] Furthermore, part E of the same paragraph utilizes almost identical language: "[e]xplicitly refusing to honor warranty obligations while acknowledging defect."[97] It is difficult to find a substantive difference between these allegations. As explained by the *AQSR* court, merely adding an allegation as to the defendant's

---

[93] D.I. 16, p. 7.
[94] *See* D.I. 1, ¶ 125, 131.
[95] *Id.* at ¶ 125.
[96] *Id.* at ¶ 131.
[97] *Id.* at ¶ 131.

state of mind when they breached the contract is insufficient to assert a breach of the implied covenant claim.[98]

All the purported actions laid out in paragraph 131 as breaches of the implied covenant have a comparable allegation laid out in the breach of contract claim paragraph 125, except for paragraph 131, D.[99] Paragraph D refers to Ballard's claim that CDE "intentionally withh[eld] software support."[100] Unlike the other allegations of wrongdoing for the breach of the implied covenant claim, this is a distinct accusation from the breach of contract claim.

However, the software use between the two companies is outlined in their agreement. Specifically, the software is mentioned in section 1.6 of the Addendum section of the Terms and General Conditions document.[101] There, the agreement states "CDE shall use reasonable endeavours [sic] (including, without limitation, by using commercially available industry recognised [sic] anti-virus software) and act in accordance with good industry practice to ensure that the Solution(s) are available for access."[102] Based on the language of the Addendum, it appears to the court that "Solutions" is software and support associated with the Plant. Therefore,

---

[98] *AQSR*, 2009 WL 1707910, at *11.
[99] *See* D.I. 1, ¶ 125, 131.
[100] *Id.* at ¶ 131.
[101] Provided as Exhibit A in D.I. 1.
[102] Exhibit A, Section 1.6 of the Addendum.

it is clear that the agreement between the parties expressly deals with the software issue, making this an issue ripe for a breach of contract claim.

For the aforementioned reasons Ballard has failed to meet the pleading standards associated with the breach of implied covenant claim. Accordingly, the motion to dismiss as to Count IV is **GRANTED**, and Count IV is **DISMISSED**.

III. Counts VI and VII, the Implied Warranty Claims, Cannot Be Dismissed at This Stage.

In Counts VI and VII, plaintiff asserts a claim of breach of implied warranty of merchantability under 6 *Del. C.* §2-314, and a claim for breach of the implied warranty of fitness for a particular purpose under 6 *Del. C.* §2-315, respectively.[103] Ballard alleges throughout its complaint that many of the parts it received from CDE were defective.[104] Defendant responds that the claims are barred by the express disclaimer in their agreement and should be dismissed.[105]

"There are two theories of recovery for breach of implied warranty under the Delaware UCC: breach of implied warranty of merchantability under 6 *Del.C.* § 2–314 and breach of implied warranty of fitness for a particular purpose under 6 *Del.C.* § 2–315."[106] "Unless there is a valid disclaimer, these implied warranties are implied in every sales transaction involving goods."[107] 6 *Del.C.* § 2–316, which

---

[103] D.I. 1, p. 39-40.
[104] *See generally* D.I. 1.
[105] D.I. 10, p. 9.
[106] *Matter of L.B. Trucking, Inc.*, 163 B.R. 709, 720 (Bankr. D. Del. 1994).
[107] *Id.*; *see also* 6 *Del. C.* § 2–314 ("Unless excluded or modified (Section 2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.");

governs the exclusions and modifications of warranties, states "to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous."[108] However, "[l]anguage to exclude all implied warranties of fitness is sufficient if it states, for example, that '[t]here are no warranties which extend beyond the description on the face hereof.'"[109]

The term "Conspicuous" is defined in 6 *Del. C.* § 1-201(b)(10), and is laid out below:

> "Conspicuous", with reference to a term, means so written, displayed, or presented that, based *on the totality of the circumstances*, a reasonable person against which it is to operate ought to have noticed it. Whether a term is "conspicuous" or not is a decision for the court.[110]

"The touchstone of conspicuousness is 'whether a person's attention can reasonably be expected to be called to the disclaimer language.'"[111] But whether a disclaimer is conspicuous is not dispositive of whether it is effective.[112] Instead,

---

*see also* 6 *Del. C.* § 2–315 ("Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required … there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.").

[108] 6 *Del. C.* § 2–316(2).

[109] *Id.*

[110] 6 *Del. C.* § 1-201(b)(10) (emphasis added).

[111] *Norman Gershman's Things To Wear, Inc. v. Mercedes-Benz of N. Am., Inc.*, 558 A.2d 1066, 1069 (Del. Super. Ct. 1989) (quoting *Lecates v. Hertrich Pontiac Buick Co.*, 515 A.2d 163, 169 (Del. Super. Ct. 1986)).

[112] *Triple-S Steel Holdings, Inc. v. Crowe LLP*, 2023 WL 7482608, at *6 (Del. Super. Ct. Nov. 8, 2023).

"[t]he timing of delivery, placement, and other like factors relating to such a disclaimer are salient issues to be resolved before determining whether it vanquishes implied warranties."[113]

The statutes and the caselaw make it clear that conspicuousness of the disclaimers lies at the heart of the inquiry.[114] Older cases consider whether the disclaimer was bolded, set off from the rest of the text, a different color, etc.[115] However, the statutory definition of "conspicuous," 6 *Del. C.* § 1-201(b)(10), was amended in 2023 to remove an explanation as to what factors should be considered.[116] Instead of listing the factors, the legislature added the "based on the totality of the circumstances" language.[117]

In *Triple-S Steel Holdings, Inc. v. Crowe LLP*, this court illustrated the considerations required by the "totality of the circumstances." There, the defendant filed a motion to dismiss claims for breaches of "the implied warranty of fitness for a particular purpose, and the implied warranty of merchantability."[118] After reviewing the disclaimer at issue in that case, the court determined "[a]t bottom, … the Court must examine the entirety of the contractual relationship between the parties, its several instruments, and the timing of their execution and delivery. It is

---

[113] *Triple-S Steel Holdings*, 2023 WL 7482608, at *6.
[114] 6 *Del. C.* § 2–316(2); *see also Norman Gershman's*, 558 A.2d at 1069; *see also Lecates v. Hertrich Pontiac Buick Co.*, 515 A.2d 163, 169 (Del. Super. Ct. 1986)).
[115] *Norman Gershman's*, 558 A.2d at 1069; *see also Lecates*, 515 A.2d at 169.
[116] DE LEGIS 174 (2023), 2023 Delaware Laws Ch. 174 (S.B. 157).
[117] *Id.*; *see also* 6 *Del. C.* § 1-201(b)(10).
[118] *Triple-S Steel Holdings*, 2023 WL 7482608, at *6.

far too early to do all that at this pleading stage."[119] Accordingly, the court denied the motion to dismiss both implied warranty claims.[120]

In the instant case, the pleadings raise an issue as to potential alterations of the final OA from the negotiated terms.[121] More information is needed as to when the disclaimer at issue was first included in the negotiations, and whether it was altered between the drafts negotiated by the parties and the final OA. As stated above, it is too early to conduct a full review of the totality of the circumstances at this point in the pleadings.

Accordingly, the motion to dismiss Counts VI and VII are **DENIED**.

IV.  <u>Count VIII, the Anticipatory Repudiation Claim, Raises and Issue of Fact</u>.

In Count VIII, plaintiff asserts a claim of Anticipatory Repudiation.[122] Ballard alleges the statements made by CDE on October 21st and November 15th were "definitive[] and unequivocal[] refus[als] to perform their obligations under the OA."[123] Defendant responds that their actions did not constitute a repudiation as they merely insisted on "contractual compliance."[124] Therefore, they seek a dismissal of the claim.[125]

---

[119] *Id.*
[120] *Id.*
[121] D.I. 1, ¶ 17-19.
[122] D.I. 1, p. 42-43.
[123] D.I. 1, ¶ 169.
[124] D.I. 10, p. 10.
[125] *Id.*

"Under Delaware law, repudiation is an outright refusal by a party to perform a contract or its conditions entitling 'the other contracting party to treat the contract as rescinded.'"[126] "A statement not to perform unless terms different from the original contract are met also constitutes a repudiation."[127] "A party may repudiate an obligation through statements when its language, reasonably interpreted, indicates that it will not or cannot perform; alternatively, a party may repudiate through a voluntary and affirmative act rendering performance apparently or actually impossible. In any event, repudiation must be 'positive and unconditional.'"[128] "A party's good faith belief that the other is already in breach of the agreement does not privilege a party to repudiate its obligations."[129]

Whether a particular statement or action by a party constitutes a repudiation may become a question of fact when the statement or action at issue it can be interpreted in different ways.[130] As a question of fact is raised, the motion to dismiss cannot and will not be granted as to this claim.

Accordingly, the motion to dismiss Count VIII is **DENIED**.

---

[126] *CitiSteel USA, Inc. v. Connell Ltd. P'ship*, 758 A.2d 928, 931 (Del. 2000) (quoting *Sheehan v. Hepburn*, 138 A.2d 810, 812 (Del. Ch. 1958)).

[127] *Id.* (citing *Johnson Forge Co. v. Leonard*, 51 A. 305, 307–08 (Del. 1902)).

[128] *Level 4 Yoga, LLC v. CorePower Yoga, LLC*, 2022 WL 601862, at *16 (Del. Ch. Mar. 1, 2022), *aff'd*, 287 A.3d 226 (Del. 2022) (citing *W. Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*, 2009 WL 458779, at *5 (Del. Ch. Feb. 23, 2009).

[129] *HIFN, Inc. v. Intel Corp.*, 2007 WL 1309376, at *14 (Del. Ch. May 2, 2007) (citing *Record Club of America, Inc. v. United Artists Records, Inc.*, 643 F.Supp. 925, 939 (S.D.N.Y.1986)).

[130] *See CitiSteel*, 758 A.2d at 931-32 (noting "[t]he question of whether Luria's September 21, 1989 letter constituted a repudiation precluding it from later declaring a default against CitiSteel was properly submitted to the jury" when the alleged repudiation letter could be interpreted in either of two ways).

V.    Count IX, the Declaratory Judgment Claim.

In Count IX of the complaint, Ballard seeks a declaratory judgment as to the rights and responsibilities of each party under the contract.[131]  Specifically, Ballard seeks a determination of CDE's duties going forward pointing.[132]  CDE moves to dismiss this allegation on the grounds that it is duplicative and fully coextensive with Ballard's breach of contract claim.[133]  Ballard responds that a declaratory judgment is needed to define CDE's duties in the future.[134]

At this stage of the litigation, I am denying the motion to dismiss this count on the basis that it is not clear to me that the breach of contract claims deal with the parties' responsibilities to each other in the future given that a three-year warranty was given with the CDE's work.  This issue can certainly be readdressed at a future time but for now it remains.

Accordingly, the motion to dismiss Count IX is **DENIED**.

## **CONCLUSION**

For the above reasons, Defendant's Motion to Dismiss Plaintiff's Complaint is **GRANTED** as to count IV, and **DENIED** on all other counts.

**IT IS SO ORDERED**.

*/s/ Francis J. Jones, Jr.*
Francis J. Jones, Jr., Judge

---

[131] D. I. 1, p. 43-44.
[132] *Id.*
[133] D.I. 10, p. 10.
[134] D.I. 16, p. 10.

cc:     File&ServeXpress